CONTINENTAL SOUTHERN LINES, INC., et al. *v.* KLAAS, et al.

June 8, 1953

No. 38493 34 Adv. S. 36 65 So. 2d 575

March 9, 1953 23 Adv. S. 3

July 3, 1953 35 Adv. S. 1 65 So. 2d 833

October 5, 1953 37 Adv. S. 8 67 So. 2d 256

*Hermon Dean, Hedgepeth & Norsworthy* and *Stevens &* *Cannada,* for appellants.

Brief of appellant, Continental Southern Lines, Inc.

804

*Ray, Spivey & Cain* and *Nelson Cauthen,* for appellees.

KYLE, J.

This case is before us on appeal by the Continental Southern Lines, Incorporated, M. S. Cox, Jr., and Lawyer Partee, defendants in the court below, from a judgment rendered against them by the circuit court of Madison County in favor of Mrs. Ida Mary Klaas, surviving widow, and Lawrence J. Klaas, Jr., and Joyce Anne Klaas, minor children of Lawrence J. Klaas, Sr., deceased, for damages for the wrongful death of the said Lawrence J. Klaas, Sr.

Lawrence J. Klaas, Sr., was killed in an automobile accident which occurred on U. S. Highway No. 51, about five miles north of the City of Canton, on September

16, 1950, when the new Studebaker automobile which he was driving collided with a cattle truck owned by M. S. Cox, Jr., and being operated at the time of the accident by Lawyer Partee, Cox's employee. Klaas at the time of the accident was driving his Studebaker automobile northwardly along the east traffic lane of the highway, and his cousin, Clarence Klaas, was riding in the car with him. The Klaas car was running at a rate of speed of about fifty miles per hour, and there is nothing in the record to indicate that Klaas was negligent in any manner in the operation of his automobile at the time of the accident. Lawrence J. Klaas, Sr., died almost immediately after the accident as a result of the injuries which he had sustained. He was 27 years of age at the time of his death, and he left surviving him a wife and two children. Clarence Klaas was also fatally injured in the accident and died before reaching the hospital. He was 28 years of age, and left surviving him a wife, but no children.

From the testimony of the eye witnesses it appears that as the Klaas car was approaching the point on the highway where the accident occurred a Continental Southern Lines passenger bus, proceeding southwardly and closely followed by a heavily loaded cottonseed truck owned and operated by Howard Smithson, Jr., and the cattle truck driven by Lawyer Partee, slowed down and came to a stop for the purpose of picking up two passengers who were standing on the west side of the highway. There was a conflict in the testimony as to whether the passenger bus was still moving or had come to a complete stop when the Klaas car passed it; but just as or immediately after the Klaas car passed the passenger bus the cattle truck swung from behind the seed truck into the path of the Klaas car, and the wreck occurred about 200 feet north of the point on the highway where the passenger bus had stopped.

It is clear from the testimony of the witnesses that the passenger bus and the two trucks were proceeding

southwardly in close formation at the time the passenger bus was brought to a stop. The passenger bus had a load of forty passengers. The seed truck was heavily loaded with cottonseed, and the cattle truck was carrying 25 head of cattle. J. C. Welch, the driver of the passenger bus, testified that he was driving at a rate of speed of approximately 45 miles per hour before he began to slow down to pick up the passengers. Howard Smithson, Jr., the driver of the seed truck, who was named as a codefendant in the plaintiffs' declaration, testified that, when the bus regained its speed after leaving Larson's store about one-half mile north of the place where the wreck occurred, he was about 300 feet behind the bus, and that he was driving about 45 miles per hour. Lawyer Partee testified that he had been following the seed truck at a distance of approximately 68 feet for about a mile when the bus and seed truck slowed down abruptly just before the wreck occurred.

The plaintiffs alleged in their declaration that Klaas' death was proximately caused by the concurrent negligence of the bus company, Howard Smithson, Jr., and Lawyer Partee.

The plaintiffs alleged that the bus company was negligent in that, at the time when the automobile which Klaas was driving was approaching the passenger bus and was about to meet the same, and when the cottonseed truck and the cattle truck were following closely behind the passenger bus, the driver of the passenger bus, without exercising due regard for the safety of the plaintiffs' decedent and other persons using the highway, negligently brought the passenger bus to a stop partially on the paved and main traveled portion of the highway, without leaving 20 feet in width of the highway or a sufficiency thereof open for the free passage of other vehicles. The plaintiffs also alleged that the bus company was negligent in bringing its bus to a stop and failing to exercise due care and caution for the safety of the plaintiffs' decedent and other persons using

the highway at that time, in that the driver of the passenger bus knew, or by the exercise of reasonable care and caution should have known, that the automobile which Klaas was driving was approaching him from the south, and that the passenger bus which he was driving was being closely followed by the heavily loaded trucks of the defendants Smithson and Cox, and that if he stopped his passenger bus on the main traveled portion of the highway under the traffic conditions then existing, without leaving a sufficient part of the highway open for the safe passage of other vehicles, there was danger and probability that the drivers of the seed truck and the cattle truck would be unable to bring their vehicles to a stop in time to avoid a collision, or to avoid entering the traffic lane in which the plaintiff's decedent was traveling, yet the driver of the passenger bus brought his bus to a stop partly on the main traveled portion of the highway and without leaving sufficient space open on the highway for the safe passage of other vehicles thereon, and thereby created a condition of great, immediate and imminent danger to the occupants of all of said vehicles, which resulted in the injury and death of the plaintiffs' decedent.

The plaintiffs alleged that Howard Smithson, Jr., was negligent in that he operated his truck at a greater rate of speed than was reasonable and prudent under the traffic conditions then existing; that he followed too closely behind the passenger bus; and that he failed to keep a proper lookout for other vehicles then using the highway. The plaintiffs also alleged that Smithson was negligent in stopping his truck too suddenly in front of the cattle truck and without giving sufficient warning to the driver of the cattle truck, thereby creating a traffic hazard which contributed to the injury and death of the plaintiffs' decedent.

The plaintiffs alleged that Lawyer Partee was negligent in failing to keep a proper lookout for other vehicles on the highway, in driving his truck at an exces-

sive rate of speed in view of the traffic conditions then existing, and in following too closely behind the seed truck. And the plaintiffs alleged that Partee was grossly negligent in attempting to pass the seed truck at a time when it was coming to a stop, and in driving his cattle truck across the center line of the highway and into the path of the oncoming Studebaker car.

Howard Smithson, Jr., was called to testify as an adverse witness for the plaintiffs. Smithson testified that he was about 300 feet behind the passenger bus when the bus regained its speed south of Larson's store; that the stop light on the bus came on several hundred feet before the bus came to a stop; and the bus slowed down gradually. He did not know where the cattle truck was at that time. He stated that the bus started pulling off on the shoulder about 150 or 200 feet before it came to a stop, and that the bus slowed down hard at that time. Smithson stated later that he had to stand on his brakes to keep from running into the bus, Smithson said that when the bus had come to a complete stop the left dual wheel was close to the edge of the pavement, approximately two feet on the pavement. He stated that, when the Klaas car passed the bus, the bus had not been brought to a complete stop; that his seed truck was only about 20 or 30 feet behind the bus; and that his seed truck was still moving as the Klaas car passed the seed truck and the cattle truck pulled into the lane of travel of the northbound vehicle. Smithson stated that he saw the collision, which occurred about 20 feet behind his seed truck, through his rear view mirror.

Lawyer Partee was also called to testify as an adverse witness for the plaintiffs. Partee testified that he never saw the passenger bus until after the wreck had occurred. He stated that when the seed truck came to a stop he was about 68 feet behind the seed truck; that he applied his brakes as hard as he could; and that the heavy load that he was carrying caused his truck to

swerve across the center line of the highway into the path of the oncoming Studebaker.

R. O. Stringer, who was president of the Northeast Mississippi Junior College and the owner of farm lands in Madison County, testified that he was driving southwardly on the highway when the accident occurred, and that he was the first person to arrive at the scene of the accident. He parked his automobile immediately behind the bus on the west side of the highway, and while he was doing that he observed the position of the bus on the highway. He stated that the rear end of the bus was approximately fifty per cent on the highway and fifty per cent off the highway, that is to say, half of the bus was on the pavement and half of the bus was off the pavement. He went immediately to the place where the wreck had occurred. The cattle truck was headed almost directly into the east bank of the highway right of way, and the front end of the Studebaker appeared to be partially under the hood of the truck. One of the injured men was still alive.

W. D. R. Stovall, state supervisor of audio-visual education, testified that he and M. P. Ewing were driving northwardly on the highway behind the Studebaker car at the time the wreck occurred. He stated that he saw the bus come to a stop just before the Studebaker car passed the bus. He stated that when he was about 200 or 300 feet in front of the bus he saw the cattle truck pull around the seed truck and cross over into the east lane of traffic and across the center line of travel, and that he saw the crash that occurred immediately thereafter. He stated that he and Ewing parked their car about 75 or 100 feet south of the point on the highway where the wreck had occurred, and went immediately to the aid of the injured men, but that they left soon thereafter to summons medical assistance. On cross-examination Stovall again stated that the bus had come to a complete stop

when the accident occurred, and he also stated that the bus was half on and half off the pavement at that time.

Dr. Margaret Wilson Johnson testified that she was traveling southwardly on the highway at the time the accident occurred; that she arrived at the scene of the accident only a few minutes after it had happened, and that she stopped to render such assistance to the injured men as she was able to render. She stated that Lawrence J. Klaas, Sr., was obviously in a dying condition when she arrived, but was still breathing. Clarence Klaas was conscious, but had a fracture of the left femur and several lacerations on his skull. She testified that Clarence Klaas was suffering, and was conscious of his suffering. Harry Baldwin, the funeral director who prepared Clarence Klaas' body for burial, brought the injured men to the hospital in an ambulance. Both were dead when they arrived at the hospital. Bob Scott, the funeral director who prepared the body of Lawrence J. Klaas, Sr., for burial, testified that the skull of the deceased was crushed, and that the bony structure of his chest was crushed in. Harry Baldwin testified that Clarence Klaas' skull was crushed, his nose and left eye torn away, his chest crushed, and his neck apparently broken.

The testimony of the defendants' witnesses may be summarized as follows: M. S. Cox testified that Lawyer Partee had been working for him about five years, and had rendered excellent service. Cox did not testify concerning the accident itself. Lawyer Partee was recalled and testified that the truck he was driving was in good condition; that he had left Jackson Thursday afternoon with a truck load of cattle for Clinton, Kentucky, and had arrived in Clinton Friday night; that he unloaded his cattle in Clinton, took on another load of cattle, and started back almost immediately. He stated that he was about 68 feet behind the seed truck when he passed Larson's store, and that he maintained that distance behind the seed truck until the driver of the seed truck suddenly

brought his truck to a stop at the point on the highway where the accident occurred. Partee stated that the driver of the seed truck slowed down suddenly, and that he jumped on his brakes immediately; that the cattle truck leaped across the highway and turned over, and that he got out of the truck after it had turned over. He stated that the bed of the seed truck was eight feet high; that he saw no stop lights on the seed truck; and that he did not know that the passenger bus was in front of the seed truck. He stated that he never intended to try to pass the seed truck.

The Continental Southern Lines, Incorporated, introduced several witnesses who testified concerning the position of the passenger bus on the highway after the bus had been brought to a stop. M. P. Ewing who was driving the automobile in which the plaintiffs' witness Stovall was riding, testified that the cattle truck pulled out very abruptly into the northbound lane of traffic just as the Studebaker car was passing the two vehicles in front of the cattle truck, and that the collision occurred immediately thereafter. Ewing stated that he was about 500 yards from the point where the two vehicles collided. He did not notice the bus at that time, and could not say whether the bus was still moving or not. He stopped his car about 75 yards from the scene of the accident, and he and Stovall went immediately to the aid of the injured men and helped lift them out of the wrecked car. Ewing stated that, when he came back to his own car, he noticed the bus, and that the bus occupied about two feet of the paved portion of the highway. Several passengers on the bus testified that the bus was brought to a smooth stop, and that it was pulled as far to the right as it could get. Mike Erickson, who had boarded the bus just north of Larson's store, testified that "it was pretty steep getting off the bus," after the bus had been brought to a stop. He estimated that the shoulder of the highway at the

point where the bus stopped was approximately five feet, and that the bus was five feet off the pavement.

J. C. Welch, the bus driver, testified that when he saw the prospective passengers flagging him he was running at a rate of speed of about 40 or 45 miles per hour. He looked into his rear view mirror to see whether there were other motor vehicles coming. He did not see anything "in the immediate vicinity." He removed his foot from the accelerator and let the bus coast to a smooth stop. His mind was on the passengers, and he pulled over to take them up. He hit the shoulder approximately 40 or 45 feet from the point on the highway where the passengers were waiting to board the bus. Welch stated that as the bus came to a complete stop he reached for his cash fare book to cut cash fares for two passengers, and about that time a lady sitting behind him said, "There has been an accident." He then looked through his rear view mirror and saw the Studebaker car and the cattle truck. He also saw the seed truck about 25 feet behind him in the west lane of travel. Welch stated that he did not know whether he had stopped at that time or was still rolling. Welch stated that, when his bus came to a stop, it was tilted slightly, and he could not have gotten any farther over on the shoulder with safety.

On cross-examination Welch stated that he did not remember seeing the seed truck when he pulled off from Larson's store. He was unwilling to say whether he saw either of the trucks when he looked in his rear view mirror after the passengers flagged him. He said that he saw the passengers when he was about halfway between Larson's store and the place where he stopped to pick them up. He said that he did not remember whether the passengers had gotten on the bus or not before the crash occurred. Welch said that he did not remember having seen the seed truck or the cattle truck at any time after he left Larson's store until he stopped to pick up the passengers. He stated that he traveled approximately

40 to 50 feet after he got his right wheels off the pavement. He said that he did not know exactly when he applied his brakes, and he did not remember giving any hand signal or mechanical signal to show that he intended to stop. He stated that his bus was eight feet wide, and that at the time he stopped from seven to ten inches of the bus was on the pavement. He stated that he did not know where the Studebaker car was at the time that he came to a stop, and that he could not say definitely that he saw the Studebaker coming up the highway.

Charles S. Smith, an employee of the bus company, who was driving another bus at the time the accident occurred, arrived at the scene of the accident a few minutes after it had happened. He testified that he stopped his bus on the right side of the highway and went immediately to the place where the injured men were lying. He found the cattle truck turned over and the Studebaker car partially under the cab of the truck. He stepped the distance from the place where the wreck occurred to the place where Welch's bus was parked and found that the distance was 225 feet. He stated that Welch's bus was on the shoulder of the road with the left dual wheel on the pavement, and that there was no shoulder left on the west side of the bus. He observed the stop lights on Welch's bus and found that they were working.

T. C. Temple, superintendent of operations of the Continental Southern Lines, Incorporated, testified that the rules and regulations of the bus company required the bus driver to pull completely off the highway and pick up and discharge passengers wherever possible. He testified that Welch's bus weighed 16,500 pounds unloaded; that it was equipped with Westinghouse brakes; and that it would require a distance of 260 feet to make an emergency stop, if the bus were traveling at the rate of 45 miles per hour.

The first point argued by the attorneys for the bus company on this appeal is that under the pleadings the

sole issue presented for consideration by the jury in this case was whether or not the location of the bus, after it came to a stop, constituted negligence on the part of the bus company, and that the court erred in permitting the jury to consider the manner in which the bus was brought to a stop. The bus company's attorneys contend that the testimony relating to the bus driver's failure to keep a proper lookout, and the bus driver's failure to give an appropriate signal of his intention to stop for a reasonable distance before stopping, and the bus driver's action in bringing his bus to a stop too suddenly and without allowing sufficient time for the vehicles behind him to reduce their speed and come to a stop with safety, was improperly admitted.

But we think that there is no merit in these contentions. The facts alleged in the plaintiffs' declaration and the negligence charged in the declaration do not admit of such narrow interpretation. The declaration clearly charged that the driver of the bus negligently brought his bus to a stop partly on the paved and main traveled portion of the highway when he knew, or by the exercise of reasonable care and caution should have known, that the automobile which the plaintiffs' decedent was driving was meeting and approaching him from the south, and that the passenger bus which he was driving was being closely followed by the heavily loaded seed truck and cattle truck, and when he knew, or by the exercise of reasonable care and caution should have known, that if he stopped his passenger bus on the main traveled portion of the highway without leaving a sufficient part of the highway open for the safe passage of other vehicles, there was danger and probability that the operators of the seed truck and the cattle truck would be unable to bring their trucks to a stop in time to avoid a collision, or to avoid entering the traffic lane in which the plaintiffs' decedent was approaching.

It may be conceded that the plaintiffs should have been more specific in stating the particular acts of neg-

ligence on the part of the bus driver which they expected to rely upon to establish the charge of negligence in the manner in which he brought his bus to a stop. But there was no real variance in the allegations of the declaration and the proof. The declaration charged that the bus driver negligently brought his bus to a stop partly on the paved and main traveled portion of the highway under traffic conditions, fully described in the declaration, which were extremely perilous. The words "negligently brought his bus to a stop," as those words are used in the declaration, cannot be interpreted to mean only that the bus driver selected an improper parking place for his bus. The words "negligently brought his bus to a stop" are broad enough in their meaning to cover all the actions taken by the bus driver in bringing his bus to a stop. For the purpose of enabling the jury to determine whether the bus driver did negligently bring his bus to a stop, it was competent for the plaintiffs to show the condition of traffic on the highway at the time and the actions of the bus driver in reducing his speed suddenly, without maintaining a proper lookout, and pulling his bus to the right, and finally stopping the bus partially on the paved and main traveled portion of the highway, without giving sufficient notice of his intention to do so for a reasonable distance before stopping.

 The evidence which the bus company sought to exclude from the consideration of the jury after both sides had rested had been admitted without objection. Much of the evidence relating to the actions of the bus driver in bringing his bus to a stop was brought out by the attorneys for the bus company themselves in the examination of the bus driver and in the cross-examination of other witnesses. If there was a variance in the charges alleged in the declaration and the proof, and we think there was no real variance, under the facts in this case the variance was not material, because there was no surprise. If the evidence had been objected to at the time

it was offered, the plaintiffs would have been permitted to amend their declaration, as provided in Section 1512, Code of 1942, and the trial would have proceeded without interruption.

In the case of Illinois Central R. R. Co. v. Price, 72 Miss. 862, 18 So. 415, the Court held that, although in an action for personal injuries, the declaration failed to allege as a ground of complaint the particular act or omission which constituted the defendant's negligence in respect to the injury complained of, if the evidence of such act was admitted without objection, it was too late, after verdict, to object because of variance.

In the case of McLean v. Culpepper, 170 Miss. 239, 155 So. 344, the main ground assigned by the appellant for reversal of the judgment of the lower court on appeal was that the Court admitted evidence that no horn or signal was sounded as the automobile approached the appellee, and that the declaration contained no count of negligence under which such evidence could be admitted. The court rejected the contention made by the appellant, and held that the evidence was properly admitted under the allegation of the declaration alleging reckless, dangerous and careless operation of the automobile.

In the case of Gower v. Strain, 169 Miss. 344, 145 So. 244, the Court held that a party could not avail himself of a variance between a pleading and proof where he did not object to the testimony on that ground when it was offered.

The record in the case that we have here shows that, after both sides had rested, the appellant bus company made a motion for a peremptory instruction, which the court overruled. The plaintiffs then moved that they be permitted to amend their declaration, so as to charge specifically that the bus driver turned his bus from a direct course and suddenly decreased its speed and stopped the bus partially on the highway without giving a proper signal of his intention to do so for a reasonable

distance before stopping and without exercising due care. The attorneys for the bus company objected to the amendment, and the court sustained the objection on the ground that the evidence had been properly admitted under the charge of general negligence, and that the matters embraced in the proposed amendment were already sufficiently alleged in the declaration. We think that, although the amendment was perhaps not necessary, it should have been allowed. ■■■ But the bus company is not now in a position to take advantage of the error of the court in refusing to allow the amendment, if there was in fact any such error, for the reason that a party will not be allowed, on appeal, to take advantage of an error which he himself committed or induced or invited the trial court to commit. 5 C. J. S., p. 173, Appeal and Error, par. 1501. ■■■ An appellant cannot rely upon defects in his adversary's pleadings when he has refused to permit an amendment which would have cured the defects. 5 C. J. S., p. 187, Appeal and Error, par. 1505; Federal Compress Co. v. Craig, 192 Miss. 689, 7 So. 2d 532.

The next point argued on behalf of the bus company is that the judgment of the lower court should be reversed and a new trial granted as to the bus company, for the reasons, first, that the location of the bus after it had been brought to a stop complied with the requirements of the statute, and, second, that the evidence fails to show that the bus driver was negligent in the manner in which he brought his bus to a stop.

In support of their argument on this point the attorneys for the bus company say that under our statute, Section 8215, Code of 1942, all that is required of passenger buses stopping to pick up or discharge passengers on the highway is that "they must pull as far to the right as practicable, including sound and safe shoulders, and must have at least 200 feet clear view in each direction." But that is not all that is required. ■■■ The driver of a passenger bus, like the operator of any other motor vehicle

on the public highway, must not only observe the statutory requirements in bringing his vehicle to a stop, but he must also exercise due care not to endanger the safety of other persons using the highway. This duty to exercise due care exists independently of any statutory regulations, and where the driver of a motor vehicle is actually negligent in bringing his motor vehicle to a stop partially on the paved and main traveled portion of the highway, the fact that he may have pulled his motor vehicle as far to the right as practicable, including sound and safe shoulders, and that there may have been a clear view of his stopped vehicle for a distance of 200 feet in each direction does not relieve him from liability for injuries proximately caused by his negligence.

 "The operator of an automobile has the right to slow down and come to a stop, to back, or to turn his car in the street or highway, but in so doing must exercise reasonable care with respect to other vehicles and pedestrians. The duty to exercise care in this respect exists independently of any regulations on the subject, and, where the driver of an automobile is actually negligent, the fact that he is violating no statute or ordinance does not relieve him of liability." 60 C. J. S., pp. 708-709, Motor Vehicles, par. 300 b.

But it is said that the prospective passengers had a right to board the passenger bus at any place along the highway that suited their convenience, and that it was the duty of the bus driver to stop and pick them up, and that in order for them to get on the bus sufficient standing room had to be left for them on the shoulder. And the bus company cites in support of this contention the cases of Mississippi City Lines, Inc. v. Bullock, et al., 194 Miss. 630, 13 So. 2d 34, and Teche Lines, Inc. v. Danforth, et al., 195 Miss. 226, 12 So. 2d 784. In the Bullock case the plaintiffs sued for damages for the death of a passenger who had alighted from the bus, and the opinion of the Court dealt only with the duty of the bus company to

provide a safe place for the passenger to alight from the bus. In the Danforth case the plaintiffs sued for damages for the death of a motorist whose car had collided with the bus while the bus was standing on the highway waiting for a passenger to alight. At the time the accident occurred the bus had been brought to a complete stop and had been standing about two minutes waiting for the passenger to get off. The Court held that the question to be decided in that case was whether the bus driver had been guilty of negligence in stopping his bus on the paved and main traveled portion of the highway without turning as far to the right as practicable, including sound and safe shoulders, and that question was for the determination of the jury. In neither of those cases did the Court discuss the effect of the bus driver's failure to maintain a proper lookout while bringing his bus to a stop or to exercise reasonable care with respect to other vehicles in the immediate vicinity whose movements might be affected by the sudden slowing down and stopping of the bus.

In the case that we have here Welch brought his bus to a stop under traffic conditions which were peculiarly hazardous, and those traffic conditions were plainly visible to him at the time that he undertook to bring his bus to a stop. The Klaas car was only a few hundred feet in front of him and was approaching him at a rate of speed of approximately 50 miles per hour. Smithson's seed truck was closing in on him from the rear and was being closely followed by Partee's cattle truck. Welch admitted that there was a constant flow of traffic on the highway. Welch knew, or by the exercise of reasonable care should have known, that the slowing down and stopping of the passenger bus partially on the paved and main traveled portion of the highway, under the traffic conditions then existing, would increase the danger of traffic accidents while the bus was being brought to a stop, and it was Welch's duty to exercise care commensurate with

the hazards involved in the slowing down and stopping of the bus under those conditions. It was Welch's duty to maintain a proper lookout and to exercise reasonable care with respect to the other vehicles on the highway, including the vehicles approaching from the rear. Collins Baking Co. v. Wicker, 166 Miss. 264, 142 So. 8. Yet Welch testified that, although he looked into his rear view mirror, he did not remember having seen the seed truck or the cattle truck from the time he left Larson's store until he stopped to pick up the passengers. Welch stated that he applied his brakes when he was only 75 yards north of the point where the passengers were standing. Smithson testified that the bus slowed down hard, and that he had to stand on his brakes to keep from running into the bus.

Whether Welch was negligent in bringing his bus to a stop was a question for the jury to determine. Collins Baking Co. v. Wicker, supra; Savery, et al. v. Gray (Miss.), 51 So. 2d 922.

There is a conflict in the testimony as to the exact location of the bus on the highway after it was brought to a stop. The shoulder on the west side of the highway for a distance of 200 feet south of the point where the wreck occurred was from 5 to 7 feet in width. Two of the plaintiffs' witnesses testified that the bus was half off the pavement and half on the pavement. Welch testified that only about 7 to 10 inches of the bus was on the pavement after it had been brought to a stop. Smithson and Ewing estimated that the bus occupied about 2 feet of the pavement. Mike Erickson testified that the bus was probably 5 feet off the pavement. The bus was approximately 8 feet in width, and according to his testimony the bus probably occupied three feet of the pavement. Several witnesses for the bus company testified that the bus was as far over on the shoulders as it could get. Howard Smithson, however, said that it was not as far over on the shoulder as it could get.

 Whether Welch was guilty of negligence in the manner in which he brought his bus to a stop, whether he was negligent in failing to keep a proper lookout for other motor vehicles using the highway, and whether he was negligent in failing to give an appropriate signal to indicate his intention to stop for a reasonable distance before stopping, whether he was negligent in stopping his bus too suddenly and without allowing sufficient time for the vehicles behind him to reduce their speed and come to a stop with safety, and whether he was negligent in failing to turn as far to the right as practicable, including sound and safe shoulders, when he brought his bus to a stop, were questions for the jury to decide. Mississippi City Lines, Inc. v. Bullock, et al., supra; Teche Lines v. Danforth, et al., supra; Gulf Refining Company, et al. v. Brown, 196 Miss. 131, 16 So. 2d 765; Missouri Pacific Transportation Co. v. Sacker, et al., 200 Ark. 92, 138 S. W. 2d 371; Hill v. Hill, 170 Kan. 721, 228 P. 2d 713; Matthews v. Mound City Cab Co., et al. (Mo. Ct. App.), 205 S. W. 243; Donahue v. Mazzoli, et al., 27 Cal. App. 2d 102, 80 P. 2d 743; Wallace v. Brende, et al., 67 S. D. 326, 292 N. W. 870; Landeen v. DeJung, et al., 219 Minn. 287, 17 N. W. 2d 648. And we think that there was ample evidence to support the findings of the jury that Welch was negligent.

 It is next argued by the bus company that, even if it be true that Welch was negligent in the manner in which he brought the bus to a stop, or in failing to maintain a proper lookout, or in failing to give proper warning of his intention to stop, or in bringing his bus to a stop too suddenly, still Welch's negligence was not the proximate cause of the collision, but that the sole proximate cause of the collision was the negligence of Lawyer Partee in driving his truck too fast, and in following too closely behind the seed truck, and in turning his vehicle abruptly into the traffic lane of the oncoming Studebaker.

But this too was a question that was properly submitted to the jury. ■■ And it was not necessary, in order to hold the bus company liable, that the jury should find that the negligence of the bus company was the sole proximate cause of the injury. ■■ There may be more than one proximate cause of an accident or injury, and where there is more than one proximate cause each of the concurrent efficient causes contributing directly to the accident or injury is a proximate cause thereof.

"As a general rule, it may be said that negligence, in order to render a person liable, need not be the sole cause of an injury. It is sufficient that his negligence, concurring with one or more efficient causes, other than plaintiff's fault, is the proximate cause of the injury. Accordingly, ■■ where several causes combine to produce injuries, a person is not relieved from liability because he is responsible for only one of them, it being sufficient that his negligence is an efficient cause, without which the injury would not have resulted, to as great an extent, and that such other cause is not attributable to the person injured. It is no defense to one of the concurrent tort feasors that the injury would not have resulted from his negligence alone, without the negligence or wrongful acts of the other concurrent tort feasor." 65 C. J. S., p. 675, Negligence, par. 110a; Cumberland Tel. & Tel. Co. v. Woodham, et al., 99 Miss. 318, 54 So. 890, 891; Lee County Gin Co. v. Middlebrooks, 161 Miss. 422, 137 So. 108; Keith v. Yazoo & M. V. R. Co., 168 Miss. 519, 151 So. 916; Brewer v. Town of Lucedale, 189 Miss. 374, 198 So. 42; Gulf Refining Co., et al. v. Brown, 196 Miss. 131, 16 So. 2d 765.

In the case of Cumberland Tel. & Tel. Co. v. Woodham, supra, the Court said: "Without attempting to define proximate cause in such terms as will be applicable to all states of fact—for to do so is practically impossible—it will be sufficient to say that the negligent act of a person, resulting in injury, is the proximate cause thereof,

and creates liability therefor, when the act is of such character that, by the usual course of events, some injury, not necessarily the particular injury, or injury received in the particular manner complained of, would result therefrom, provided the attendant circumstances are such that an ordinarily prudent man ought reasonably to have anticipated that some injury would probably result from the act done. In order that a person may be liable for damages resulting from his negligence, it is not necessary that his negligence should have been the sole cause of the injury. His negligence may be the proximate cause, where it concurs with one or more causes in producing an injury, and, although the author or authors of such cause or causes may also be liable therefor. 29 Cyc. 492-496, inclusive, and authorities there cited.''

The Court in its opinion in that case quoted with approval the following statement from Harrison v. Kansas City Electric Light Company, 195 Mo. 606, 93 S. W. 951, 7 L.R.A. (N.S.) 293: ''If a defendant is negligent, and his negligence combines with that of another or with any other independent intervening cause, he is liable, although his negligence was not the sole negligence, or the sole proximate cause, and although his negligence, without such other independent intervening cause, would not have produced the injury.''

In Solomon, et al. v. Continental Baking Company, 172 Miss. 388, 160 So. 732, the appellants sued the appellee for damages resulting from an automobile driven by one of the appellants' servants at night running into the rear of a truck owned by the appellee, which was without a rear red light and was parked on the right-hand side of the road. In discussing the question of proximate cause the Court in its opinion in that case said:

''We will assume, but merely for the purpose of the argument, that the appellants' driver approached the truck without observing pertinent 'laws of the road' in so doing. Nevertheless, such negligence did not supersede the prior negligence of the appellee's driver. First,

it does not appear from the evidence that this negligence of the appellants' driver, assuming that such there was, was of such character that the collision would have resulted therefrom even if the truck had been equipped with a rear red light. Second, where an act of negligence is a substantial factor in bringing about an injury, it does not cease to be a legal and proximate cause thereof because of the intervention of a subsequent act of negligence of another which contributed to the injury, if the prior act of negligence is still operating, and the injury inflicted is not different in kind from that which would have resulted from the prior act. 2 Restatement, Torts, Secs. 440-447; Cumberland Tel. Co. v. Woodham, 99 Miss. 318, 54 So. 899; Public Service Corp. v. Watts, 168 Miss. 235, 150 So. 192.''

 It may be conceded that the failure of Lawyer Partee, the driver of the cattle truck, to observe the requirement of Section 8188, Code of 1942, and to keep his vehicle under proper control, largely contributed to the accident which resulted in the death of the plaintiffs' decedent. Yet, the negligence of Lawyer Partee cannot be regarded as the sole proximate cause of the accident, since it was clearly shown that the action of Lawyer Partee in suddenly pulling his truck across the north bound lane of traffic was taken in an effort to avoid the danger created by the action of the bus driver in bringing his bus to a stop under the conditions testified to by the witnesses. The action of the bus driver in bringing his bus to a stop partly on the paved and main traveled portion of the highway under the conditions testified to by the witnesses represented an active and unseen force which set in motion the acts of Smithson and Lawyer Partee which finally resulted in the negligent injury and wrongful death of the plaintiffs' decedent.

 ''The doer of an original wrongful act that should reasonably cause one to anticipate an injury therefrom is not relieved from liability for an injury immedi-

ately brought about by an intervening cause, wrongful or otherwise, that is set into operation by such original wrongful act, and that alone would not have caused the injury, but which with the aid of the original wrong does cause such injury," Johnson v. Mallory, 123 Neb. 706, 243 N. W. 872, 875. See also Gulf Refining Co. v. Brown, 196 Miss. 131, 16 So. 2d 765.

In the case of Gulf Refining Company v. Brown, supra, the suit was brought by Brown to recover of the Gulf Refining Company and S. W. Stewart, the value of a tractor and oil tank trailer and approximately 3,500 gallons of gasoline being transported by the truck, when the same was destroyed as a result of a traffic accident caused by the alleged negligence of Stewart, an employee of the Gulf Refining Company, when he stopped his automobile in the entrance to and extending partly on Tallahala Creek Bridge on U. S. Highway 84, approximately one mile east of Laurel, Mississippi.

In discussing the question of proximate cause, the Court in its opinion in that case said:

"The position of the Stewart car on the bridge did not cease to be a legal and proximate cause of the accident because of the intervention of the Chevrolet car, for the reason that when the driver of the Chevrolet got to where Stewart's car was, he had to turn to his left to go around. He turned to his left because Stewart's car was stopped on the right. Then too, the Stewart car was still there when the appellee's oil truck arrived at the scene. It was the Stewart car that was struck at its left rear end by the oil truck when the latter was evidently trying to turn to the left and avoid the impending tragedy. How then can it be said that this car only provided the condition for and not a contributing proximate cause of the accident?

"Without regard to the position of the Chevrolet car immediately before and at the moment of the accident, the legal principle here applicable is clearly stated in the

case of Cumberland Tel. & Tel. Company v. Woodham, 99 Miss. 318, 54 So. 890, 891, where it was said in quoting with approval from 29 Cyc. 492-496 that 'If a defendant is negligent and this negligence combines with that of another, or with any other independent intervening cause, he is liable, although his negligence was not the sole negligence, or the sole proximate cause, and although his negligence, without such other independent intervening cause, would not have produced the injury.' Of course, Stewart could not have anticipated that the particular injury complained of would have resulted from his negligent act, or that an injury would have occurred in the particular manner in which it did on that occasion, but he should have reasonably anticipated the happening of the intervening event which transpired to cause an injury in the instant case, since he was required under the law to anticipate the approach of other vehicles from the rear at any moment.

"Conceding that the failure of the driver of the appellee's oil truck to have the same under control, and that his action in failing to observe other requirements of the said Chapter 200, Laws of 1938, known as 'The Uniform Highway Traffic Regulation Act,' largely contributed to the accident in question, nevertheless it cannot be regarded as the sole proximate cause of the oil truck being wrecked and burned on the occasion complained of, it being clearly shown that the presence of the Stewart car continued to be a factor in bringing about this needless tragedy."

It is next argued on behalf of the bus company that the court erred in granting certain instructions to the plaintiff.

In the first instruction complained of the court instructed the jury as follows:

"If you believe from the evidence in this case that the defendant bus company stopped its bus on, or partially on the paved and main traveled portion of the highway

without turning it as far to the right as was practical, including sound and safe shoulders, or stopped its bus partially on the paved and main traveled part of the highway without leaving as near 20 feet of the paved part of the highway as was practical open and unobstructed for the free passage of other vehicles, or brought its bus to a stop partially on the paved and main traveled portion of said highway without exercising ordinary care for the safety of other persons using said highway by keeping a proper lookout for following and oncoming traffic and by giving an appropriate signal of his purpose to stop for a reasonable distance before stopping and that either of such acts by the said defendant, if you believe from the evidence it was guilty of any of them, was a proximate and contributing cause of the injury and death of plaintiffs' decedent, it would be your duty under your oaths to return a verdict against the defendant bus company notwithstanding the fact that other persons may have contributed to such injury and death.''

The errors complained of are (1) that the instruction incorrectly describes the duty of the bus company with reference to leaving 20 feet of the paved part of the open highway for traffic; (2) that the instruction contains theories upon which liability can be based which are not alleged in the declaration; (3) that the instruction does not furnish a definite guide to the jury as to the specific negligence of which the bus company must be guilty before the jury would be warranted in returning a verdict against the bus company; and (4) that the instruction contains theories upon which liability can be predicated which are not based upon the evidence. We do not think that the criticism made of the instruction is a valid criticism. It was certainly the duty of the bus driver, under the facts in this case, to turn his bus as far to the right as practicable in bringing his bus to a stop. The Klaas automobile was approaching rapidly in plain view of the bus driver, and the two heavily loaded trucks were

closing in on the bus from the rear. Under these conditions which were clearly shown there was no error in that part of the instruction relating to the duty of the bus driver to turn his bus to the right as far as practicable. The other criticisms made have been answered in other parts of this opinion.

■■■ In the next instruction complained of the court instructed the jury as follows:

"The court instructs the jury for the plaintiffs that it is the duty of persons about to stop vehicles on or partially on the paved or main traveled portion of a highway to exercise ordinary care for the safety of other persons using such highway, and even if you should believe from the evidence that the driver of defendant's bus gave appropriate signals for a reasonable distance of his purpose to decrease his speed and stop, if you further believe from the evidence that he did not exercise ordinary care for the safety of other persons then using the highway in bringing his bus to a stop at the place and in the manner and under the circumstances shown by the evidence, and that his failure to exercise such ordinary care was a proximate cause of the injury and death of plaintiffs' decedents, it is your duty under your oaths to return a verdict in favor of plaintiffs and against the defendant bus company."

Complaint is made of this instruction on the ground that the instruction failed to furnish the jury a definite guide as to what might constitute negligence on the part of the bus company in bringing its bus to a stop. But this instruction must be considered along with the other instructions which the court granted, and when so considered, we do not think that the instruction is subject to the criticism made of it.

■■■ The next instruction granted to the plaintiffs, to which objection is made, relates to the action of the bus driver in turning his bus from a direct course upon the highway and bringing his bus to a stop, without giving an

appropriate signal of his intention to do so for a reasonable distance before doing so. We think that there was no error in the giving of that instruction.

██ ██ Complaint is also made of an instruction granted to the plaintiff defining the meaning of proximate cause. The attorneys for the bus company admit that the instruction which the court granted was correct as far as it went. But they contend that the instruction should have included a statement that the bus company was not bound to a prevision or anticipation which would include an unusual, improbable or extraordinary occurrence. But if the bus company wanted an instruction of that kind, it should have requested such instruction.

Complaint is also made that the court refused to grant instructions to the bus company to the effect: (1) That if the jury believed that the accident occurred prior to the time that the appellants' bus came to a stop, then it must find for the appellant; (2) that if the jury believed that the accident would have occurred just as it did, even though the bus had been run completely on to the shoulder of the highway, then the jury should find for the appellant; (3) that if the jury believed that the bus was pulled as far off on the shoulder as was practical, including and taking into consideration sound and safe shoulders and the care of the passengers, it should find for the appellant; and (4) that it was the duty of the driver of the bus to stop and pick up the passengers where he had a clear view of 200 feet in each direction, even though it were not possible to get the bus off of the paved or main traveled section of the highway. For the reasons stated above there was no error in the refusal of the court to grant the above mentioned instructions.

██ ██ Finally, the argument is made on behalf of the bus company that the amount of the verdict is excessive. The jury returned a verdict for $50,000.00. The trial judge ordered a remittitur, and entered judgment for the sum of $40,000.00. The record shows that the plaintiffs' dece-

dent was 27 years of age at the time of his death. His life expectancy was 40.36 years. He was mentally active and in excellent health at the time of his death. He was engaged in the plumbing business and in the sale of electrical and plumbing supplies. He was earning at the time of his death $300.00 per month. The plaintiffs were entirely dependent upon him for financial support. By his death they have been deprived of his financial support and his companionship and protection. We cannot say that the amount of the judgment is excessive.

The appellants, M. S. Cox and Lawyer Partee argue three points as grounds for reversal of the judgment against them: (1) That the verdict of the jury is contrary to the overwhelming weight of the evidence; (2) that the negligence of Welch, the bus driver, was the proximate cause of the accident; and (3) that the verdict is excessive.

The appellants say that the sole proximate cause of the accident was the negligent manner in which the Continental Southern Lines' bus was brought to a stop; that Partee, when the cottonseed truck was brought to a sudden stop in front of him was confronted by a sudden emergency, which made it necessary for him to act immediately to avoid bodily harm to himself; and that he chose the course of action which any reasonably prudent person situated as he was would have chosen under similar circumstances. The appellants say that the emergency with which Partee was confronted was not due to Partee's negligence, and that Partee exercised reasonable care to avoid injury to himself and others when the emergency arose, and was not guilty of negligence when his truck collided with the oncoming Studebaker car.

But the rule relating to sudden emergencies cannot be invoked by Lawyer Partee and his employer, for the reason that the testimony of the witnesses and the testimony of Partee himself showed that the emergency was proximately caused by the fault of Partee himself, which contributed to the injury and death of the plaintiffs'

decedent. Jones v. Dixie Greyhound Lines, Inc., 211 Miss. 34, 50 So. 2d 902.

Section 8188, Code of 1942, provides that "The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway." The statute also provides that "The driver of any motor truck or motor truck drawing another vehicle, when traveling upon a roadway outside of a business or residence district, shall not follow within 150 feet of another motor truck or motor truck drawing another vehicle."

According to Partee's own testimony, when Smithson applied his brakes, Partee was only 68 feet behind him, and Partee had been following the seed truck at a distance of about 68 feet for at least a mile. Thus it appears from Partee's own testimony the emergency which required immediate action by Partee to avoid a collision with the seed truck was proximately caused by Partee's failure to comply with the requirements of the above mentioned statute. "Where the situation of peril arises because of the driver's own negligence, the emergency rule cannot be invoked in his behalf." 5 Am. Jur., p. 601, Automobiles, par. 171.

 The jury was amply justified in finding that Partee was negligent, and that Partee's negligence proximately contributed to the injury and death of the plaintiffs' decedent. The judgment of the lower court is therefore affirmed.

Affirmed.

*Hall, Arrington* and *Ethridge, JJ.,* concur.

*Lee, J.,* took no part.

---

Roberds, J., dissenting.

I agree the judgment should be affirmed against Partee and Cox, but I do not think any negligence has been shown on the part of the Bus Lines. The declaration

grounded negligence against the Bus Lines on the fact of stopping the bus at the time and place and under the circumstances hereinafter shown. It did not, when tested by rules properly applicable to pleading, charge any negligence in the manner of bringing the bus to a stop. Counsel for plaintiffs clearly recognized and admitted that by asking permission of the court to amend the declaration and charge that the Bus Lines "suddenly decreased" its speed, without giving a "warning" signal. That was made after the testimony was all in, both sides had rested and the court had overruled a motion for a peremptory instruction on liability of the Bus Lines. The trial court admitted the testimony under his conception that the allegations of the declaration charged "general" negligence. However, in this dissent, in considering the question of negligence of the Bus Lines, I will discuss the testimony applicable both to the manner of stopping, and the fact that the bus was stopped, at the time and place in question. And it is of the utmost importance to clarity and justice to recognize, at the outset, that the Bus Lines had the right, and, indeed, it was its duty, to stop the bus and pick up the passengers at this time and place. This was a straight road for over a mile in distance. The pavement was twenty feet wide, with good, safe shoulders of five to six feet in width on either side of the pavement where the bus stopped. In other words, the road was thirty to thirty-two feet wide. The bus had stopped at this place and discharged and picked up passengers for years. The specific question of the right to stop the bus for boarding and departing passengers was involved in Teche Lines, Inc. v. Danforth, et al., 195 Miss. 226, 12 So. 2d 784. In that case the pavement was twenty feet wide and the shoulders on each side were three and one-half feet wide, "making a total width of twenty-seven feet." The stop was about half way down an incline. The bus was about eight feet wide, as here, "so that when some room was left to the passenger to alight on the shoulder, and not in the ditch,

it was impossible to leave twenty feet clearance opposite the bus." An instruction told the jury that "if less than twenty feet clearance was left by the bus, this was negligence." In denying that contention this Court, construing Section 90, Chapter 200, Laws 1938, said:

"The central principle which runs through all the cases dealing with statutes regulatory of highway traffic is that such statutes must have a practical or workable interpretation, not an arbitrary or unreasonable construction, and never that which would require an impossibility; and this has been the rule from the earliest enactments of such statutes down to this day. We do not prolong this opinion by going into a review of pertinent cases from other states. Hundreds of them are cited and annotated in the elaborate note found in 131 A. L. R., pp. 562 to 607, among which we might mention Kelly v. Locke, 186 Ga. 620, 198 S. E. 754, as particularly persuasive. No case has been cited by appellee, nor have we found any, which under its particular facts would sustain the quoted instruction under facts such as are presented by the record here before us. * * *

"While admitting, as must be admitted, that impossibilities are not required by any statute whatever its subject, it has been argued that when impossible to stop so as to leave as much as 20 feet clearance, the vehicle must keep going until a place may be found where the required clearance can be left, and that argument has proceeded so far as to say that if this require a going forward of ten miles or even farther, this must be done or else the statute would be violated.

"This Court may, and it is its duty to, take judicial knowledge of what everyone knows who has been beyond his own door sill, that at least 85% of the public highways of this state are of such width that it is only occasionally possible, and this often at distant intervals, to stop a vehicle so as to leave as much as twenty feet of unobstructed highway to the side of the vehicle. To give the statute in question the literal or hard and fast con-

struction for which appellees contend would lead to unthought of and absurd consequences, which every experienced member of the legislature would be bound to disclaim as ever having been in his mind as a deliberate conclusion. It is enough to say of this that if such a construction could be sustained and enforced, it would dislocate and put out of business the rural mail delivery service on not less than 75% of the rural routes in the state, and a husband could not pick up his wife trudging homeward from the rural grocery store in the rain, or even to attend to a wounded or sick person found on the roadside. * * *

"Aside from absurdity or unthought of consequences, we may advance a step, and a very vital step, further, and to the following inescapable consideration: 'The right of a citizen to travel upon the public highways and to transport his property thereon in the ordinary course of life and business is a common right which he has under his right to enjoy life and liberty, to acquire and possess property, and to pursue happiness and safety. It includes the right in so doing to use the ordinary and usual conveyances of the day; and under the existing modes of travel includes the right to drive a horse-drawn carriage or wagon thereon, or to operate an automobile thereon, for the usual and ordinary purposes of life and business.' Thompson v. Smith, 155 Va. 367, 154 S. E. 579, 583, 71 A. L. R. 604, 610. There seems to be no dissent among the authorities on this proposition. See 11 Am. Jur. Constitutional Law, Sec. 329, p. 1135, and the language of the Court in Pinkerton v. Verberg, 78 Mich. 573, 44 N. W. 579, 7 L. R. A. 507, 18 Am. St. Rep. 473.

"The right to travel means, of course, the right to go from one place to another. It includes the right (1) to start, (2) to go forward on the way, and (3) to stop when the traveler's destination has been reached. To speak of the first two of these as fundamental rights without including the third would be to descend again to the absurd,

and so far as the instant case is concerned that is what we have here. But we do not so limit the right. We affirm that it includes the right to stop on the way, temporarily, for a legitimate or necessary purpose when that purpose is an immediate incident to travel. So it is that the texts and authorities declare that the right to stop when the occasion demands is an incident to the right to travel, a proposition so completely self-evident that no authority is necessary to sustain it, and which we would pronounce irrefutable, had it never heretofore been mentioned. But here are some of the authorities which do declare and sustain it. 2 Blashfield Automobile Law, Perm. Ed., Sec. 1191, p. 321; Fulton v. Chouteau County Farmers' Co., 98 Mont. 48, 37 P. 2d 1025; Morton v. Mooney, 97 Mont. 1, 33 P. 2d 262, 263; Albrecht v. Waterloo Const. Co., 218 Iowa 1205, 257 N. W. 183. When, then, the right to stop is arbitrarily or unreasonably restricted, or cut off by statutory enactment, the statute is as objectionable from a constitutional standpoint as had the enactment prevented going forward.

"The rights aforesaid, being fundamental, are constitutional rights, and while the exercise thereof may be reasonably regulated by legislative act in pursuance of the police power of the State, and although those powers are broad, they do not rise above those privileges which are imbedded in the constitutional structure. The police power cannot justify the enactment of any law which amounts to an arbitrary and unwarranted interference with, or unreasonable restriction on, those rights of the citizen which are fundamental. State v. Armstead, 103 Miss. 790, 799, 60 So. 778, Ann. Cas. 1915B, 495.

"Since, as already mentioned, this Court must take judicial knowledge of what everybody knows, namely, that at least 85% of the public highways in this State are of such width that it is only occasionally possible, and this at distant intervals, to stop a vehicle so as to leave as much as twenty feet of unobstructed highway, which

would mean that over long stretches of our public roads no vehicle could stop without violating the law, if that clause in the statute which requires that in any event twenty-foot clearance shall be left is to be enforced according to its literal terms, detached from the remainder of the statute, the result would be an unreasonable and arbitrary abridgment of the right to travel, thus rendering the statute unconstitutional when so interpreted, and to the extent so interpreted.''

And what is the testimony as to the manner of bringing the bus to a stop in the case at bar? The accident happened about 11:30 on Saturday morning. It was a clear day. The bus was making its usual trip from Columbus, Mississippi, to Jackson, Mississippi. It stopped at Larson's store, a half mile north of the scene of the accident. It started up and pulled back into the highway. Smithson said he was then about a quarter of a mile north of the bus, and the cattle truck was three-tenths of a mile north of the Smithson truck. The bus continued south, gaining some momentum until he was running some forty to forty-five miles. No one claims the bus, in covering that distance, ever ran over forty-five miles an hour. Indeed, the great preponderance of the testimony, including that of many of the passengers on the bus, was that it never got over forty miles. But within that distance of one-half mile Smithson had caught up with the bus and Partee had caught up with Smithson. Now, all of the testimony is to the effect that some three hundred feet before reaching the passengers who were flagging the bus to stop, the bus began to gradually slow down. Smithson and the bus driver said that; a number of the passengers testified to that effect, as did Hardy, one of the prospective passengers and the one who was flagging the bus. Indeed, not a witness said otherwise. The testimony of all these and several other passengers said the slow down was gradual. Some described the slowing down as ''real slow''; some as ''very normal'':

most of them as "smooth." So we have some eight or ten witnesses testifying that the method of stopping was in a proper manner and evidenced skill, care and caution. Not a witness testified otherwise. These witnesses, other than Welch, the driver of the bus, had not the slightest interest in the outcome of this lawsuit, except that it is conceivable that Smithson, to exculpate himself, might have had an interest in showing that the bus was negligent, yet he never testified to one fact showing that. All of these witnesses were in position to know the facts. Again Smithson said the bus gave the proper signal it was going to stop. The rear stop-lights came on. He saw that; he knew the bus was slowing down to pick up passengers. Smithson said when the bus began to slow down three hundred feet before the stop that he, Smithson, then put on his brakes. The bus began to gradually ease onto the right shoulder some 200 feet before reaching the awaiting passengers. None of this is contradicted. Partee could not contradict it, because he said he never saw the bus. He didn't know it was in front of Smithson. The only possible contradiction of the proper manner of stopping this bus, mentioned in the majority opinion, is the statement that Smithson said that at one time he pushed down hard on his brakes. He did say that, but he explained when and why that happened. He said it happened when he was attempting to pass the bus, as it was slowing down and going onto the shoulders, and he saw the Klaas car approaching from the south and he then put on his brakes to get back behind the bus, which he did. Here is what Smithson said about that: "Q. * * * as you gained on the bus, when you get to within 300 feet back of the bus, then you saw the red stop light of the bus come on for the first time, didn't you? A. Yes. Q. Then I believe you said that you did not apply your brakes immediately, did you? A. Almost immediately. Q. Was not the first thing that you did was to pull to the left a little to see if you could pass the bus? A. After

I applied brakes. Q. You did not apply them very hard at that time, you said a moment ago you did not put on your brakes right at first? A. Not hardest. Q. Because your first impulse and your intention was to pass that bus, was it? A. Yes. Q. Then it was that you saw the Studebaker car going north? A. Yes. Q. Then you pulled back to your right to get behind the bus, didn't you? A. Yes. Q. If you had not pulled around in an attempt to get by the bus and then saw the Studebaker car, you could have stopped behind the bus any time you wanted to. In other words, as the bus came to a stop you came to a stop? A. Yes. Q. Is that right? A. Yes. Q. You had your truck fully under control at all times? A. Yes. Q. And you could have stopped, could you? A. Yes. Q. And you finally did stop, didn't you? A. Yes.'' Smithson repeatedly said he had his truck under control and could have stopped at any time. There was no jury issue as to the manner of stopping this bus. No witness found fault with that.

But it is argued that the position of the bus after it stopped established negligence contributing to the injury. This is the charge in the declaration: ''* * * the driver of said passenger bus nevertheless negligently brought the same to a stop partly on the main traveled portion of said highway and without leaving sufficient space open on said highway for the safe passage of other vehicles thereon, and thereby created a condition of great, immediate and imminent danger to the occupants of all of said vehicles * * *'' which resulted in said injuries. There are two answers to that contention—one is, that the proof shows without substantial contradiction that the bus got as far off the highway as it possibly could, and the other is that the position of the bus after it stopped had not the slightest causal connection with the accident.

The contention of appellees, on the stated issue of fact, and the basis of the majority holding, as I understand it, is that there was a dispute in the testimony as to whether

the bus got as far off the paved part of the highway as it safely could do, and that the jury resolved that question against the Bus Lines.

As stated, the pavement was twenty feet wide and the shoulders on either side were from five to six feet, the exact width not being shown. The bus was exactly eight feet one and a quarter inches in width. On the west side, where the bus stopped, a ditch ran north and south, parallel with the road. This ditch was some two and a half to three feet deep and was approximately three to five feet across at the top. Considerable grass was upon this shoulder extending from the pavement to, and into, the ditch. Of course, the bus could not get down into this ditch, and prudence warned against getting too close to it, having due regard for the safety of the passengers on the bus. Seven witnesses testified directly as to the position of the bus, after it stopped, as related to the ditch.

Miss Ashley was a passenger on the bus. She lived in Jackson, Miss. She was a student at Holmes Junior College. She got off the bus after the accident and after the bus stopped. She said "We had to step into the ditch to get out of the bus." Asked the position of the bus as to the ditch, she said, "It pulled as far to the right as it could get." In another place she said: "It pulled over just as far as it could possibly get."

Miss Bolling was a passenger going from Ethel to Canton, Miss. She was sitting on the seat just behind the driver. She got off the bus. She was asked, "You got off. Where was the bus then with reference to the shoulder and pavement? A. Off as far as it could get; when I got off the bus I had to step down in the ditch." Again she said "* * * I had to go down in the ditch to get off the bus." She was asked "When you got back in the bus how did you get in it?" and she replied "Caught ahold of the door and pulled up." She said the ditch was about three feet deep, and getting back into the bus was rather difficult for her. She also said the bus

was leaning towards the west because of its closeness to the edge of the ditch.

Mike Erickson was a passenger. He said in his opinion the bus could not have gotten any closer to the ditch.

Leonard Hardy was the man who flagged the bus to stop. He said when the bus pulled to the west he and his wife and children, who were going to board the bus, had to get into the ditch to avoid the bus striking them. He said "* * * When he pulled on the shoulder, when he began to crowd me I got in the ditch, where mother and children were." The bus stopped even with him.

Mrs. Trudy Trantham lived in Jackson, Miss. She was a student at Holmes Junior College, Goodman, Miss. She was a passenger on the bus. She was asked if it was possible for the bus to go further to the right, and she replied "No, there was a ditch. I don't believe—I don't believe it would have been possible without his going over in the ditch."

Welch, the driver, was asked: "Mr. Welch, would it have been possible for you to have gotten any further over with safety?" He replied "No." He further said there was a "drop" in the shoulder of the ditch—"my bus was tilted just a little, leaning towards the field."

Charles W. Smith, driving another passenger bus of the Bus Lines, arrived from the north at the scene of the accident within a few moments after it happened. He stopped his bus behind where the Welch bus was standing. He paid particular attention to the location of the Welch bus. Here is his examination on that: "Q. Where were the right wheels situated, if you know, with relation to the edge of the shoulders. A. They were far over, over to the right. Q. How much, if any, shoulder was there remaining from the west side—on the west side of the bus? A. West side of the bus? Q. Yes. A. Was not any there."

Every witness said the bus was parallel to the paved part of the highway.

It will be noted that these witnesses were in position to note and state the facts. Most of them got down into the ditch as they got onto and alighted from the bus. Not a witness contradicted the facts stated by them, unless, by inference, there is some slight contradiction in the testimony I now set out.

All of the witnesses, except Stringer and Stovall, placed the left wheels of the bus about two or two and a half feet upon the west edge of the pavement—some less than two feet. Stringer said he thought the bus was about half on and half off the highway. That would place the bus about four feet on the pavement. Of course, that was a mere estimate. Here was Stringer's situation: He says he was driving south. He was behind the cattle truck. He did not see the accident. He thinks he was about the first man to arrive at the scene after the accident. He said the cattle were out of the cattle truck and running about some three hundred feet north of the scene of the accident. He was asked, ''Approximately how far north of the accident did you meet these cattle? A. Oh, I met them, I judge, about 300 feet.'' He stopped and parked his car on the west side of the highway north of the passenger bus and the Smithson truck and rushed immediately across the road to aid those injured in the wreck. Now, it is just a matter of human reaction and common sense that he did not, under such circumstances, pay attention to the position of the passenger bus. He does not claim that he did that. He admits he was simply expressing an opinion and giving, as he said, an ''approximate'' estimate of the position of the passenger bus on the paved part of the highway.

Stovall was driving north some distance behind the Klaas car. He said he saw the Partee truck pull into the east traffic lane and collide with the Klaas car. He explained the movements of the colliding cars—how they came together, etc. He was, of course, meeting and passing the bus, and could not possibly have been paying

much attention to it while noting the movements of the Partee truck and the Klaas car as they collided. But as to the position of the bus, he was asked: "Where did this bus stop with reference to pavement of the highway?" He replied "As well as I remember the bus was just about the shoulder, the right edge of the pavement, the rest of the bus was just about in line with the pavement, with the edge of the pavement. Q. That would make half of the bus on the west shoulder and half of the bus on the pavement? A. Yes." In another place he said he thought that was about the position of the bus.

Neither witness claims to have seen the ditch nor does either undertake to say how close the right side of the bus was to the ditch. And any conclusion that their guess, or estimate, of the position of the bus on the pavement and shoulder, made under the above circumstances, should prevail over the positive, direct testimony of the several other witnesses, who were right at the bus and in position to note, with accuracy, its position, would be against the great weight of the testimony. However, we may concede that Stringer and Stovall were accurate in their estimates, yet there was no negligence on the part of the passenger bus. Their testimony places the right side, or steps, of the bus within two feet of the top of the ditch, even giving plaintiffs the benefit of as much as six-foot shoulder, and the estimate of the width of the shoulder is five to six feet. Surely it cannot be said to be negligence on the part of the bus not to drive closer than two feet of this ditch. Two feet, even according to the estimates of Stringer and Stovall, was the space afforded passengers in boarding and alighting from the bus. I cannot conceive that negligence can be based upon that situation. Indeed, had some passenger been injured by falling into the ditch, when only two feet had been provided for entering and leaving the bus, the injured person, with plausible reason, might have claimed it was negligence not to leave more space than the two feet. The testimony of

Stringer and Stovall, accepted in its broadest implications favorable to plaintiff, and disregarding all other testimony on the question, could not possibly establish negligence on the part of the Bus Lines.

But, under the testimony in this record, the position of the bus, after it had stopped, had no causal connection whatever with the accident. The bus had not come to a stop when the Klaas car met and passed it. The entire east paved lane, in which the Klaas car was traveling, and at least five feet of the west paved lane, were clear. Smithson had attempted to pull out and pass the bus; saw the Klaas car coming, put on his brakes and pulled back behind the bus—all before the Klaas car ever met the bus. By actual measurements, and by undisputed testimony, the collision between the Partee truck and the Klaas automobile occurred 225 feet north of the place where the bus stopped. So far as the bus was concerned there was not the slightest interference with the travel of the Klaas car. That is true also of the attempt of Smithson to pass the bus. He was back behind the bus and in full control of his truck, with the ability, he said, to stop it at any time, before the Klaas car ever met the bus. So far as Smithson and the bus were concerned the road was clear for the Klaas car, and, as to the bus, Klaas had more room for travel when the bus stopped to the right of the road than would have been the case had the bus proceeded in the west paved lane of the road, as it had a right to do.

Neither under the theory of the manner of stopping the bus nor its position after it did stop has any negligence been shown on the part of the Continental Southern Lines, Inc.

The cause of this wreck was the action of Partee in operating his truck too close behind Smithson, so that when the latter stopped Partee had to turn onto the wrong side of the highway to avoid hitting him. If he had been driving at a proper distance behind the vehicle ahead and

had kept his truck under proper control, as Smithson did, he would have been able to stop in a normal manner without swerving into the east lane and colliding with the Klaas car. The unfortunate accident was not attributable to the position in which the bus stopped nor to the manner of stopping, for if either of those factors had been the negligent cause of the wreck, it would have been the Smithson truck rather than Partee's truck that would have gone into the wrong lane and caused the death of Mr. Klaas.

*McGehee, C. J.*, and *Holmes* and *Lotterhos, JJ.*, join in this dissent.

---

### ON MOTION PRIOR TO DECISION FOR ADDITIONAL ORAL ARGUMENT

McGehee, C. J.

The appellants in the two above-styled cases have filed a motion to be allowed to reargue both of the cases on the ground that when the same were originally argued and submitted, Justice Julian P. Alexander, now deceased, was a member of this Court, and that since the argument and submission of the cases, and before the decision thereof, the personnel of the Court has changed in that Justice Fred J. Lotterhos has succeeded Justice Alexander as a member of the Court.

It appears that the cases were originally scheduled to be argued and submitted before Justices Roberds, Alexander, Hall, Kyle, and Holmes, a quorum of the Court under the constitutional amendment inserted by the Legislature at its 1952 session. It further appears from the minutes of the Court that Justice Arrington sat and heard the original arguments in the place and stead of Justice Alexander, who was temporarily absent from the bench when these cases were argued. The five members of the Court who heard the original arguments are still members

of the Court and are participating in the decision of the cases, which are now being considered by the entire membership of the Court, including Justice Lotterhos as successor of Justice Alexander, deceased, and no original opinion has been written or decision rendered in either of the cases.

The appellees have filed an objection to the granting of the motion for additional oral argument and have pointed out that Justice Alexander, deceased, did not hear the original arguments and that there is no precedent or need for the same to be argued before Justice Lotterhos as successor of Justice Alexander, deceased.

In the case of McKay, et al. v. Lemly, et al., decided en banc by the Court April 25, 1949, and reported in 206 Miss. 456, 40 So. 2d 281, there was a change in the personnel of the Court after the cause had been argued and submitted, in that Justice Hall had succeeded Justice Griffith upon the expiration of the latter's term of office, and before a decision had been rendered in the cause. The Court sustained a motion in favor of the appellants for reargument before the Court as thus newly constituted on the ground that the case had been argued before a six-member court while Justice Griffith was a member thereof, and that the appellants were entitled to reargue the case before the six judges who were to render the decision therein, including Justice Hall. No opinion was written in deciding the motion for reargument.

We have concluded that neither our action in granting reargument in McKay, et al. v. Lemly, et al., supra, nor in any other case which the Court has heretofore decided, is a precedent for sustaining the motion in the instant case, and that ■■ ■■ since under the constitutional amendment of 1952, whereby the Court was increased from six to nine members, it is provided that five out of the nine members of the Court shall constitute a quorum, we should not sustain the motion now before us in view of the fact that all five of the justices who sat and heard the original argu-

ments are now present and participating in the decision to be rendered in each of said causes. The motion for additional oral argument is therefore overruled.

Motion overruled.

All Judges concur.

## ON SUGGESTION OF ERROR AND MOTIONS

ETHRIDGE, J.

This cause was affirmed on June 8, 1953, by a decision of four judges with four judges dissenting. The suggestion of error by Continental Southern Lines, Inc., attacks the decision on the merits. The case has now been thoroughly reconsidered on the merits by all nine members of the Court, and five of us are of the opinion that the original decision on the merits is correct and that the judgment of the lower court should be affirmed.

Appellant Continental Southern Lines, Inc., has also filed a motion that this case be remanded to the docket for consideration by a full panel of nine judges, and a motion for oral argument on the precedent motion. Since all nine judges are now participating in the decision, those motions have become moot and are hereby dismissed.

Suggestion of error overruled and motions dismissed.

*Hall, Lee, Kyle* and *Arrington, JJ.,* concur.

*McGehee, C. J.,* and *Roberds, Holmes* and *Lotterhos, JJ.,* dissent on suggestion of error. All Justices concur on motions.

## ON SECOND SUGGESTION OF ERROR AND MOTIONS

ETHRIDGE, J.

Appellant, Continental Southern Lines, Inc., has filed (1) a motion requesting this Court to set aside the opinions, orders and judgments rendered in these cases and to remand them to the docket for consideration and adjudication by all nine of the Judges, on the argued

ground that the original decisions, 65 So. 2d 575, 596, were void, since the affirmance was by a four to four vote, and four judges cannot affirm a case, and hence it is argued the affirmance on suggestion of error by five judges, 65 So. 2d 833, 834, is not a valid ratification of the original judgment; (2) a motion to argue orally the preceding motion; (3) a suggestion of error directed both to the dismissal of similar motions in 65 So. 2d 833, 834, and to the merits of these cases. In the opinions of July 3, 1953, all nine of the judges participated in the decision on the merits and overruled the suggestions of error, by a five to four vote, and all nine of the judges concurred in a dismissal of substantially similar motions there made because they had become moot. 65 So. 2d 833, 834. Hence the Court on suggestion of error pretermitted the question of whether a case may be affirmed by four judges, since five joined in the final decision.

The stated motions and the suggestion of error directed to the opinions of July 3, 1953, and the orders thereon, dismissing the motions there before the Court, and the briefs thereon, deal with the same constitutional issue which the Court finally disposed of on that date. It was there decided that the decision on suggestion of error by a majority of five judges constituted a valid and final judgment, and that the question raised by Continental Southern Lines in its motions as to the effect of the original four to four decision was moot, and was therefore pretermitted, since a majority of five judges rendered the final judgment. To the same effect is Joe Ready's Shell Service Station & Cafe, et al. v. Mrs. Mary L. Ready, 65 So. 2d 268, on suggestion of error, Miss. Advance Sheet No. 35, page 12; see also Carney v. Anderson, 214 Miss. 504, 517, 58 So. 2d 13, 59 So. 2d 262 (1952). ██ Accordingly the two motions, and suggestion of error directed to the dismissal of the motions described in 65 So. 2d 833, 834, are overruled.

The balance of the suggestion of error attempts to deal with questions submitted on the merits of the case and

finally decided in the opinion and judgment on suggestion of error in July 1953. Rule 14 (3) of this Court provides: "After a suggestion of error has been sustained, or overruled, by the Court, no further suggestion of error shall be filed by any party." Hence that part of the suggestion of error by Continental is dismissed.

Motions to set aside prior judgments herein, and for oral argument thereon, and suggestion of error to dismissal of motions on July 3, 1953, are overruled, and suggestion of error on the merits is dismissed.

All Justices concur.

ROBERDS, J., Separate Opinion.

I concur in the opinion herein, based upon the record as now confronting us, but I think the request for oral argument on the present motion should be granted. The present motion is directed to a state of facts, involving legal principles, different from the facts and principles existing when the former motion was heard, which new factual situation, and the principles arising therefrom, have come about by reason of the opinion itself on the former motion.