FEDERAL COMPRESS CO. v. CRAIG.

(In Banc.   April 13, 1942.)

[7 Co. (2d) 532.   No. 34813.]

690

Dugas Shands, of Cleveland, for appellant.

Alexander & Sparkman, of Cleveland, for appellee.

694

Argued orally by **Dugas Shands**, for appellant, and by **W. B. Alexander, Jr.**, for appellee.

**Griffith, J.**, delivered the opinion of the court.

On the occasion in question there were stored in the compress, owned and operated by appellant, about 15,000 bales of ginned cotton, not yet compressed. These bales

were stacked or piled in tiers, each tier composed as follows: The bottom bale on the floor was placed standing on end. The height of a bale standing on end is approximately 56 inches. Next to this bale and against it another bale was placed also standing on its end. On top of these two bales, two other bales were placed end upon end, as a second deck, which raised the height to 112 inches. On top of these end-to-end bales, a third deck of bales was placed, lying upon their flat sides. The width of a bale, from one flat side to the other, is 30 inches. This would make the height of the tier 142 inches. The tiers were thus two bales wide and three bales high, and were continued in length as desired, it appearing that the particular tier here involved was about 40 feet long from east to west.

Between these tiers were aisles each of sufficient width to permit the bales in the tiers to be taken down into the aisles, and when taken down to be carried through the aisles to the press by hand trucks. On August 7, 1939, appellant was putting the cotton through the press in anticipation of the approaching crop, and four of its employees assisted by a foreman were engaged in breaking out tier 14, that is to say, they were taking down the cotton in that tier, and trucking the bales to the press. Two of them, at the particular time here under consideration, were trucking, while appellee and another were taking down the bales from the second deck of the tier.

As is manifest from the situation, the top bales, those lying on their flat sides, must be taken off first before those next below them in the second deck can be handled. But it appears that the customary method followed by appellant in breaking out the tiers was not to remove first all the top bales in a particular tier, but the method pursued was to start at one end of the tier and, proceeding thence toward the other end, to remove for several feet the top bales, and thereupon to follow progressively from the end of the tier by removing the second deck of the bales, which was done by two employees on the floor, one

on each side of the bale, who, with cotton hooks and working jointly, would tilt the bale to the floor.

On the morning when this injury occurred, the crew had started at the east end of the tier, and the top bales had been thrown off for a distance of several feet west of where appellee was injured. Appellee and a fellow employee, as heretofore mentioned, were breaking out the second deck, and, according to the evidence in appellee's behalf, while appellee was on the floor of the aisle with his back to the west, and had hold of a bale of the second deck with a cotton hook, his co-worker cooperating with him on the other side of the same bale, one Nassar, who was the foreman of the crew, threw off a bale from the top of the tier a few feet west of where appellee was then working, and the thrown bale bounced and struck or fell upon appellee, causing a serious personal injury.

There is sufficient evidence from which a jury could find that it was the custom in this work that when a bale was about to be thrown from the top, a warning shout such as "lookout" would be given by the person who was about to throw the bale into the aisle below, or that it would be given by some person so placed as to give this warning; but the testimony strongly preponderates that no such warning was given on the instance in question. And the evidence is sufficient to sustain a finding, if the jury should so find, that while appellee was busily engaged in handling a bale in the second deck in the customary manner, by which at the time it was necessary that his back be turned to the west, the bale which injured him was, without warning, thrown off the top from the west and to his back, when and where he did not see it, and could not see it and at the same time do his work, and that as a reasonably prudent employer, appellant should have reasonably foreseen that an injury such as did happen was likely to occur from such a course or method of doing this work.

The rule applicable to such a case is summarized in McLemore & McArthur v. Rogers, 169 Miss. 650, 152 So.

883, 884, which was a case where, in the course of the work, and as a consequence of the method of work being there pursued, fragments of concrete were thrown from above striking a workman below, and of this the court said: "The general principle is that, where the master has used reasonable care to furnish a reasonably safe place to work, the character of the work considered, and like care to furnish reasonably safe appliances with which to work, the duty rests upon the servant to take care of himself as to all the ordinary and obvious dangers which arise in the progress of the work. . . . The converse is equally true that, where the master places his servant at a place and in a character of work which exposes the servant to hazards against which the servant cannot, by the use of due care, protect himself and at the same time do his work, the master must then take reasonable care to warn the servant or to erect guards, if either of these are reasonably practicable, and, if not, the master must so order and control the method of the work as to obviate the danger, so far as reasonably practicable." This announcement was reaffirmed in Ross v. Louisville & N. R. Co., 178 Miss. 69, 172 So. 752.

The questions are therefore, first, whether the servant, considering his experience and the character of the work, could or could not by the use of due care protect himself and at the same time do his work; and if this issue be resolved in favor of the servant, then second, whether there were available means or methods, reasonably practicable, by which the master in the exercise of reasonable care could and should have avoided the danger to his servant. As said in Eagle Cotton Oil Co. v. Pickett, 175 Miss. 577, 585, 166 So. 764, 766, that while "danger does not create liability, but the failure of the master to exercise ordinary or reasonable care to protect his servants from the dangers necessarily incident to their employment does create liability, and we think that under the facts here in evidence it was the province of the jury to say whether or not, in adopting a plan or method of

performing the work . . . the appellant exercised reasonable care.'' And if a reasonably safe plan or method is reasonably available and practicable, it is the nondelegable duty of the master to use reasonable care to see to it that such a plan or method is established, not only, but that at all times it shall be actually maintained, carried out and observed. Albert v. Doullut & Ewin, 180 Miss. 626, 178 So. 312. These are jury questions to be determined under appropriate instructions, and from the nature of such a case it is manifest that particular care must be taken that the instructions are properly drawn.

From what has been said, it would follow that the verdict and judgment in favor of appellee might be allowed to stand, except for the following features, which are now necessary to be considered.

First, the original declaration is not sufficient to form the predicate for proof of the case as hereinabove stated. That declaration alleged substantially no more than that Nassar, the foreman, negligently threw down the bale which struck appellee, and the case, as stated, was bottomed upon the theory, apparently, that since the negligent act was done by a foreman, this was enough. But the proof showed that in throwing down the bale the foreman had joined with fellow employees in the manual work of a laborer and in the details of the work in which they were then and there engaged, whereby the doctrine announced in Lagrone v. Mobile & O. Railroad Co., 67 Miss. 592, 7 So. 432, and consistently followed, as may be seen by Harper v. Public Service Corp., 170 Miss. 39, 154 So. So. 266, forms a barrier to a recovery by appellee, when the case is confined to his original declaration. Appellant seasonably objected to any evidence not within the original declaration, but the court overruled all objections on the untenable notion, as is well disclosed by the record, that inasmuch as some negligence was charged, this was sufficient to cover any negligence whatever the character of it might be.

But when all the evidence in behalf of appellee, the plaintiff, had been introduced and received, and which, under the aforementioned rulings of the court, had been admitted far beyond the allegations of the original declaration, and which as admitted proved or substantially tended to prove the case as stated by us in the opening paragraphs of this opinion, appellee awakened to the realization that his declaration was not sufficient to cover the case which he had made by his proof, and repenting of his original contention, he thereupon moved to be allowed to amend his declaration, as provided by Section 567, Code 1930, so as to bring the merits of the controversy between the parties fully and fairly to trial, and the amendment was tendered at the same time in writing. To the allowance of the amendment appellant objected, and the court refused it, presumably upon the erroneous notion, all along entertained by the court, that no further pleading in behalf of plaintiff was necessary beyond the charge of some negligence, be that negligence whatever the proof might show it to be.

The amendment as tendered, although not as accurately or skillfully drawn as might have been, or perhaps would have been, had plaintiff not been pressed for time in the course of the trial, was sufficient nevertheless when viewed in the light of Section 521, Code 1930, in that it contained enough in matter of substance for the court to proceed upon the merits of the cause and as shown by the proof; and having been tendered within the time allowed by the statute, the amendment should have been allowed.

But it was not allowed; and appellant now contends, in effect, that it was entitled to the peremptory charge in its favor, because appellee had no case under the original declaration, and has no case under the proposed amended declaration for the reason that the amendment was not allowed and that as a consequence the record must stand as if no amendment had been offered. If appellant is now to prevail because of the absence of the amendment,

it would be by way of advantage of an error which, by objecting to the amendment, appellant invited or induced the trial court to commit, and this would be in the face of the rule that a party will not be allowed, on appeal, to take advantage of errors which he himself committed or induced or invited the trial court to commit. 5 C. J. S., Appeal and Error, sec. 1501, p. 173. And the principle prevents reliance by an appellant upon defects in his adversary's pleading which was the result of his refusal to permit an amendment which would have cured the defect. 4 C. J., p. 703, note 70; 5 C. J. S., Appeal and Error, sec. 1505. In Haley v. Kilpatrick, 8 Cir., 104 F. 647, 648, 44 C. C. A. 102, the rule was applied in the holding that an appellant may not complain of a variance caused by the absence of allegations in the pleadings when that part of the pleadings was stricken out on appellant's own motion, and the court concluded with the observation that "he will not be permitted to take advantage of his own wrong." If he could have no advantage because of what he procured to be stricken out, then upon the same principle he can have no advantage of what, by opposing an amendment, he procured to be omitted.

It follows that appellant cannot have a reversal and a final judgment here, based upon the disallowance of the amendment. Nor may appellee have an affirmance as if the amendment had been permitted, for this introduces, as a second feature, the consideration that had the amendment been allowed appellant would have been entitled to make a showing for a continuance, and to shape its defense so as more definitely to meet the case as presented by the amendment.

And as a third feature, the main instruction granted at the request of appellee was erroneous in that it was capable of an interpretation which would mislead the jury to the conclusion that danger alone is a test of liability—the essential elements of reasonableness were nowhere mentioned. When the action, if maintainable at all, is such that it must be based upon the failure of

the master to use reasonable care to prescribe, maintain, and observe a reasonably safe method—if and when such a method is reasonably available from a practical standpoint—under which the course of the work shall be conducted, the instruction or instructions upon those issues must be such that the jury can see therefrom with reasonable clarity what are the several factual features which, if supported by the preponderance of the evidence, will bring the case within the stated substantive rule. The instruction should have been in several respects more carefully phrased.

Reversed and remanded.

### Dissenting Opinion.

**Anderson, J.,** delivered a dissenting opinion.

There should have been a directed verdict for the appellant. It is only when the master's work is complex and dangerous that he should safeguard his servants by the adoption and promulgation of rules and regulations for their safety, and see that such rules and regulations are enforced. Albert v. Doullut & Ewin, 180 Miss. 626, 178 So. 312, and authorities cited in the opinion in that case. There was no complexity in the work Craig was doing, he had been doing compress work for about ten years and his co-workers for sometime. The work was simple and without danger, except such dangers as were at once apparent to the simplest mind. The servants knew of whatever dangers there were and how to avoid them better than the master could have known. Why should the master make rules and regulations for carrying on safely a piece of work when the servants know better than the master could possibly know how it should be carried on. A farmer employs a lot of field hands to hoe his cotton crop, they are expected to do the work along together, they are used to such work. Should the master adopt methods and rules for the work where the dangers of it are at once apparent—there is no complexity? To

require him to do so would simply mean to inform the servant of something he already knew, and knew better than the master and more accurately.

The result of our position is that we do not reach the ground on which the majority opinion reverses the judgment.

Smith, C. J., concurs in this dissent.