PLANTERS BANK *v.* T. M. GARROTT, JR., et al.

No. 41557 July 11, 1960 122 So. 2d 256

250

*Fred B. Smith,* Ripley; *Dulaney & Dulaney,* Tunica, for appellant.

*McClure, Fant & McClure,* Sardis, for appellees.

KYLE, J.

This case is before us on appeal by the appellant, the Planters Bank of Tunica, Mississippi, contestant, from a decree of the Chancery Court of Tunica County, affirming the decision and order of the State Banking Board directing the Comptroller of banks to issue to the appellees, T. M. Garrott, Jr., G. D. Perry, S. W. Owen, J. W. Caperton and Henry G. Lee, prospective incorporators, a certificate authorizing them to incorporate and organize a new bank in Tunica County, to be known as the Tunica County Bank, as prayed for in the application filed by said prospective incorporators with the Comptroller.

The record shows that the above named appellees on July 28, 1958, gave notice to the State Comptroller of the department of bank supervision of their desire to engage in banking and filed their application for a certificate of authority to incorporate under applicable laws of the state, as provided for in Section 5160, Mississippi Code of 1942, Recompiled. The applicants also filed with the State Comptroller a copy of the proposed articles of incorporation, duly sworn to by one of the pros-

pective incorporators. The State Comptroller promptly gave consideration to said application, and made an examination of the proposed articles of incorporation to determine if they met all requirements of law. The State Comptroller then made an investigation of the several matters which he was required to investigate by Code Section 5160, supra, to determine whether the public necessity required that the proposed new bank should be chartered and permitted to operate. When he had completed his investigation, he recorded his findings in writing, and drew up his recommendations to the State Banking Board, and set a date for the hearing of said application by the State Banking Board and called a meeting of said Board. The State Comptroller gave due notice of said meeting to the prospective incorporators of the proposed new bank and all other interested persons and extended to them an invitation to be heard in writing or in person by the Banking Board. Notice of said meeting was given to the appellant and to all banks in all counties adjoining Tunica County.

The meeting of the State Banking Board for the purpose of considering said application was begun and held on January 27, 1959. The appellant Planters Bank appeared, by its attorneys on that date, and stated that it desired to contest the appellees' application, and asked to be admitted as a party to the hearing. The appellant's request was granted. Four and one-half days were consumed in the taking of testimony, and at the conclusion of the hearing, on February 25, 1959, the Board rendered an opinion and decision in favor of the prospective incorporators. The Board found that public necessity required that the new bank be chartered and permitted to operate, and an order was duly entered directing that a charter be issued. From that decision and order the appellant prosecuted an appeal to the Chancery Court of Tunica County, and on October 8, 1959, the chancellor rendered his opinion and entered a decree affirming the order of the State Board.

The chancellor found that the finding of the State Board that public necessity required that the proposed new bank be chartered and be permitted to operate was supported by substantial evidence and was not arbitrary or capricious, and that no prejudicial error had been committed by the Board in the proceedings before it or in the rendition of its decision and order.

The appellant's attorneys have assigned and argued four points as grounds for reversal of the decree of the lower court:

(1) That the appellant was denied the right to a fair hearing and due process of law by the action of the State Banking Board in withholding from the record at the time of the hearing and treating as confidential the findings of the State Comptroller showing the results of the investigation which he had made pursuant to the requirements of Section 5160, Code of 1942, Recompiled, prior to the meeting of the State Banking Board, to determine whether the public necessity required that the proposed bank be chartered.

(2) That the court erred in refusing to compel certain of the appellees' witnesses to answer questions on cross-examination as to the source of their alleged information that the appellant's officers had the reputation of using the bank to promote their political ambitions and their personal business enterprises.

(3) That the Board failed to render such opinion at the conclusion of the hearing as the statute required, in that the opinion rendered contained no findings of fact and gave no reasons for the Board's decision, but merely stated a conclusion.

(4) That the order of the Board finding that a public necessity existed which required that the proposed new bank be chartered and permitted to operate, was not supported by substantial evidence, but was manifestly erroneous, arbitrary and capricious.

The record in this case consists of two volumes of pleadings, affidavits and exhibits, and six volumes of

testimony taken during the hearing before the State Banking Board. It would serve no useful purpose for us to undertake to incorporate in this opinion a detailed analysis of the exhibits or a digest of the testimony of the witnesses. But, before proceeding to a consideration of the above mentioned assignments of error, it is necessary that we make a brief statement concerning the nature of the testimony offered on behalf of the respective parties.

The record in this case shows the following facts concerning the area in which the proposed bank is to be located: Tunica County has an area of 458 square miles lying wholly within the Mississippi Delta. The population of the county according to the 1950 census was 21,658, the white population being 3,939, and the Negro population being 17,719. The total assessed valuation of taxable property in the county at the time of the hearing was $11,231,374. There is only one bank in the county, the appellant Planters Bank, which was chartered in 1912 and is domiciled in the Town of Tunica. The county is traversed from north to south by U. S. Highway No. 61, which is a heavily traveled paved highway, and by two lines of railroad, and three gas transmission lines. The chief source of income for the people of the county is agriculture. The value of the agricultural products produced and marketed during the year 1958 was approximately eleven million dollars. There are 26 cotton gins, two fertilizer distributing plants, one oil mill, five grain elevators, one cotton compress, two sawmills and one manufacturing plant in the county. There are two new automobile sales agencies, and several used car sales agencies, also the usual number of mercantile establishments, gasoline and oil distribution agencies and service stations. The record shows that there have been three bank failures in the county during the last 50 years. The Bank of Tunica, which was founded about 1888, became insolvent and was forced to close in June 1913. The Citizens Bank of Tunica was chartered in 1916 and be-

came insolvent ten years later. The Bank of Dundee, located in the Town of Dundee, was organized in 1919, but was liquidated three years later. There has been only one bank located in the county since 1926, the Planters Bank, which has been operated under capable management and has grown steadily during the last 40 years. Its original charter provided for the issuance of capital stock in the amount of $20,000. That amount has been increased by charter amendments three times, and at the close of business on December 31, 1958, the bank had outstanding capital stock of the par value of $105,000. The bank's surplus at that time amounted to $315,000; its undivided profits, $24,972.03; and reserves, $45,719.81. The bank's deposits amounted to $5,448,548.46. The loans and discounts amounted to $1,477,514.08.

The appellees' evidence showed that the five prospective incorporators were men of good morals and sound business character, having a financial worth of $3,250,000; that there were 153 subscribers for stock in the new bank, which was to have a capital structure of $150,000, to be credited as follows: $100,000 to capital account, $25,000 to a paid-in surplus account, and $25,000 to an undivided profit and loss account. The appellees' evidence also showed that the subscribers of stock had agreed to the organization of a realty company, with a capital stock of $50,000, which was to erect and equip a bank building on a suitable lot to be leased by the realty company to the new bank for a nominal consideration and later conveyed to the banking corporation for a nominal consideration. It was the opinion of the appellees' witnesses that there was a real public need in the county for the establishment of a new bank which would bring additional bank deposits into the county and help create new wealth. The prospective incorporators testified that, in their opinion, the new bank would bring into the county as much as one million dollars in deposits from out of state banks; that they had been assured of sufficient deposits to maintain a successful

banking operation; that the county could support two banks; and that the new bank would not weaken the appellant bank.

T. M. Garrott testified that he knew that many residents of Tunica County carried sizeable bank deposits in Memphis banks, and some of that money would be deposited in the new bank if such bank were organized; that most of the deposits which he and the other incorporators expected to get for the new bank would come from banks outside of Tunica County. G. D. Perry testified that, in his opinion, another bank was badly needed in the county; that it was a matter of common knowledge that there was politics in the Planters Bank —''Everybody knows it.'' Perry stated that all of the presidents of the Planters Bank, all that he knew of, had been sheriff of the county, that there were two of the younger members of the Board of Directors whose fathers had held the office of sheriff. Perry stated that in his opinion the bank had not been rendering adequate service to meet the needs of the county. He stated that the new bank would probably have on deposit by the end of the first year $1,500,000; that he thought the bank would get one million dollars of that amount from banks outside of Tunica County; and that he hoped to get a half million dollars from Tunica. He stated that the Planters Bank was a strong financial institution and that a loss of 10 per cent of its deposits would not hurt it. J. W. Caperton testified that he was engaged in the implement business and the fire and casualty insurance business, in the Town of Tunica, and that 30 or 40 per cent of the checks which he received were drawn on banks located outside of Tunica County; and that people whom he knew who had money in other banks, had made the statement to him that if they had another bank ''they would put their money back home.'' Sterling Owen testified that people were entitled to freedom of choice of the bank where they were doing business, and that there was every indication of a need for a second financial

institution in the county because of the wide trade area of the county.

The appellees' evidence as a whole emphasized the fact that the appellant, being the only bank in Tunica County, had a monopoly of the banking business in the county; that there were many people in the county who did business with banks located outside of Tunica County; and that there was dissatisfaction among some of the people with the lending policy of the bank and with exchange charges made by the bank which continued in effect until July 1958, when the movement was launched to organize a new bank. There was also evidence which tended to show that the officers of the appellant bank were definitely identified with and actively participated in a political organization which sought to control the election of county officers.

The testimony of the witnesses offered on behalf of the appellant was to the effect that the appellant bank was fully capable of meeting the banking needs of the area, and that there was no real public necessity for the creation of another bank; that the economy of the county was almost wholly agricultural, and that 41 per cent of the privately-owned land was owned by nonresidents; that under the government crop control program there had been a steady decline during the last several years in the acreage planted in cotton; that the mechanization of farming in the Delta had reduced the need for an abundance of unskilled labor, and the Negro population had shown a steady decline during the last ten years. It was also shown that crop production loans to planters were usually made by the Production Credit Corporation and the Staple Discount Association, and that long-term loans were usually made by the Federal Land Bank or insurance companies. It was the opinion of the appellant's president and vice president that the appellant bank, during the last ten or fifteen years, had granted 99½ per cent of the loans for which applications had been received, and that there was no need for

another bank in the county for money-lending purposes. The appellant offered in evidence a map which showed that there were 24 commercial banks, other than the appellant, located an average distance of 13.8 miles from the Tunica County line. It was also shown that the bank had in recent years erected a new bank building at a cost of approximately $160,000; and that, by virtue of its large capitalization, including surplus and undivided profits, the appellant had a maximum lending capacity to a single borrower of $63,000. It was the opinion of the appellant's witnesses that the organization of a new bank would result in withdrawal of substantial deposits from the appellant bank and a substantial weakening of the appellant's position as a banking institution. The appellant's witnesses denied the charge that the loan policies of the bank had been influenced by political considerations or a desire to promote the privately-owned business interests of the bank's officers and shareholders.

Having thus summarized briefly the evidence offered on behalf of the respective parties, we shall now consider the appellant's assignments of error in the order mentioned above.

 We think there is no merit in the appellant's claim that the opinion and order of the Board should be reversed for the alleged reason that the appellant was deprived of its right to a fair hearing or was denied due process of law as a result of the Board's action in withholding from the record the findings of the Comptroller, showing the results of the investigation which he had made, pursuant to the requirements of Code Section 5160, prior to the meeting of the Board, or in treating the findings as confidential.

 One may not complain on review of errors below for which he was responsible, or which he invited or induced the trial court to commit. 5 C.J.S., Appeal and Error, par. 1501, and cases cited. See also Federal Compress Co. v. Craig, 192 Miss. 689, 7 So. 2d 532; Con-

tinental Southern Lines v. Klass, 217 Miss. 795, 65 So. 2d 575, 833: Talbott v. Perkins, 225 Miss. 8, 82 So. 2d 570.

The record in this case shows that after the Board had convened on January 27, 1959, for the hearing on the application of the prospective incorporators for a certificate authorizing the incorporation and organization of the new bank, and after counsel for the respective parties had announced their appearances on behalf of their clients, the chairman stated to the attorneys in open session that the Comptroller had completed the examination and had made the investigation required of him by Code Section 5160, supra, and had recorded his findings in writing, and had drawn up his recommendations and submitted the same to the Banking Board; and that the thing that troubled the chairman was, ''the question of when the recommendations of the State Comptroller come into the record.'' The chairman then referred to the statute, and asked the appellant's attorney, ''What is your interpretation of that, Mr. Smith?'' The appellant's attorney asked permission to read the statute; and the appellant's attorney then read aloud the provision of the statute, that ''When the State Comptroller has completed the examination and made his investigation, he shall record his findings in writing and shall draw up his recommendations and submit the same to the Banking Board hereinafter provided for.'' The appellant's attorney then said: ''Now, I assume that has been done.'' The chairman stated that it had been done. The chairman then stated that it was his opinion that a fair interpretation of the meaning of the statute was that the Comptroller should record his findings in writing and make his report to the Board in executive session, as he had done; and the chairman then said: ''Now, if you lawyers want to see it, I don't think this Board would have any objection to your seeing it. * * * Of course in the course of the hearing it is conceivable that he (the Comptroller) may change his opinion, or he may be even more firmly con-

vinced that his original idea about it was right. We are willing to be amenable to any suggestion or agreements that you may have on it."

After the chairman had made his statement the appellees' attorney stated that the appellees would not require that the Comptroller make his recommendations in advance of the hearing, and that he might make his recommendations to the Board in executive session, if he saw fit to do so. The appellant's attorney then made the following statement:

"By Mr. Smith: On behalf of the opponents, we submit this matter entirely to the discretion of the Banking Board to do whatever they think is best under the law, and under the circumstances whatever you determine will be entirely agreeable to us."

The Chairman then said: "That's just as fair as can be. In view of the statements of counsel from both sides, I will direct that Mr. McMullan's recommendation will be placed in the record, as seems to be required by the statute, in order to show the jurisdiction of this meeting here today, and it will be so considered for that purpose, and then at the end he of course can make it or change it in any way he sees fit."

The general rule, as stated in Corpus Juris Secumdum, in what has been called a full and authoritative treatment and an excellent discussion, is that "an appellant or plaintiff in error is estopped, or will not be permitted, to take advantage of errors for the commission of which he was responsible, or which he himself committed, caused, brought about, provoked, participated in, created, or helped to create, or contributed to, or which he has invited or induced the trial court to commit, as where the ruling, or error, was made at his request or suggestion, or on his urging, or where he procured the making of the ruling or the taking of the action." 5 C.J.S., 857, Appeal and Error, par. 1501.

But it is argued that the statute specifically provides that the Comptroller's finding shall be made a part of the record on appeal; that the findings are not in the record; and that the appellant was deprived of the benefit of the Comptroller's findings on its appeal to the chancery court, and for that reason the decree of the chancellor should be reversed. But the order of the Board shows that the Comptroller's report and reommendations were filed and heard and considered by the Board during the hearing; and if the appellant wished to have the same included in the record on appeal it should have taken steps to have them included in the record on appeal, and this it failed to do. Great A. & P. Tea Company v. Majure, 176 Miss. 356, 167 So. 637.

For the reasons stated by this Court in its opinion in Love v. Mississippi State Board of Veterinary Examiners, 230 Miss. 222, 92 So. 2d 463, the findings of the Comptroller should have been filed and made available for inspection by the interested parties as a part of the record during the hearing. But the appellant by its own action was responsible in part for the error complained of and is estopped to take advantage of the Board's failure to make the findings of the Comptroller available for inspection during the hearing.

The appellant's attorneys, in their argument in support of their second assignment of error, refer specifically to statements made by T. M. Garrott and other witnesses who testified on behalf of the appellees to the effect that some of the appellant's officers had the "reputation" of using the bank to promote their political ambitions and their personal business enterprises.

T. M. Garrott testified that, while he was talking to people about subscribing for stock in the new bank, he was surprised to learn from the remarks made to him that the general reputation of the Planters Bank was that prospective borrowers' chances of obtaining loans from the bank depended to some extent on their actions in supporting or failing to support the bank's candi-

dates for political offices, and on how they spent their money in the purchase of supplies and services which they needed and whether they patronized business establishments in which the bank officers and members of the board of directors were financially interested. Garrott stated that the general reputation of the individual members of the bank was that they tried to dictate to their customers their politics, and that on a number of occasions people who talked to him had told him such stories as that. Garrott was asked on cross-examination to name the persons who had made such statements. The appellees' attorney objected to the witness being required to name the persons who had made such statements to him. The chairman stated that he did not think that the Board had the right to require a witness to disclose any confidential information at such public hearing unless the witness was willing to do so; that the Board, however, would take into account the witness' failure to name the persons when it came to consider the probative value of the testimony. Garrott was asked whether any pressure had been brought to bear on him as a borrower of money from the bank to compel him to "trade" with anybody. Garrott stated that there had not been any such pressure brought to bear on him.

Another witness for the appellees, Barney W. Walker, a Baptist preacher who was living in Jackson at the time of the trial, testified that he lived in Tunica County and had been pastor of the Baptist church at Tunica for a period of seven years, and that he had heard many people express themselves as feeling that the county needed another bank since there was only one back in the county; that he had heard some of these people say that, when the time came for an election, if the bank had favored them with a loan, they would be reminded that they ought to vote for the slate of candidates that the bank had selected. The witness also stated that he had heard people express the opinion that, if the bank made a loan to an individual and that individual was in the market for products or insurance which were handled by

a business establishment or insurance agency which was owned or controlled by one of the members of the board of directors of the bank, the borrower was expected to obtain such products or insurance from such business establishment or insurance agency. On cross-examination the witness was asked if he would mind calling the names of the persons whom he had heard say that the bank undertook to control the voting of its customers in political elections. He stated that he did not think it would be fair to the people themselves for him to call names.

The appellant's attorneys say that the action of the Board in refusing to require the witness to state the names of the parties who had made such statements constituted a denial of the appellant's right of cross-examination and a denial of the appellant's right to a fair trial.

We think the appellant's attorneys had a right, during their cross-examination of the witnesses, to ask the witnesses to give the names of the persons who had made such statements, and that the Board should have directed the witnesses to give the names of the persons who had made such statements. But the failure of the Board to require the witnesses to give the names, if in fact they could do so, in our opinion had no material effect upon the result of the hearing. Each of the witnesses was subjected to a rigid cross-examination by the appellant's attorney on the question of "public necessity" for the establishment of a new bank, and on all other matters concerning which he had testified on his direct examination. Both sides offered in evidence unsworn statements, exparte affidavits and unsworn petitions signed by numerous citizens of Tunica County; and much other hearsay and opinion evidence is found in the record. The refusal of the witnesses to give the names of the persons who had stated to them that the appellant's officers had the "reputation" of using the bank to promote their political ambitions or their per-

sonal business enterprises affected only the credibility of the witnesses who testified that they had heard such statements; and, assuming that there was error in the Board's refusal to require the witnesses to give the names of persons who had made such statements to them, such error, in our opinion, could have had no material effect upon the result of the hearing before the State Board. Testimony based upon what someone else has said out of the hearing of the party to be charged is intrinsically weak; and when the witness refuses to give the names of the persons who made such statements, the evidence is of little or no probative value; and, from the remark made by the Board's Chairman, mentioned above, it appears that the members of the Board so understood the matter.

■■■ It is generally held that the erroneous exclusion of evidence is not reversible error unless it is prejudicial to the substantial rights of the appellant or plaintiff in error. 3 Am. Jur., 585, Appeal and Error, par 1030, and cases cited. "Exclusion of evidence of little, or without, probative value is harmless." See 5A C.J.S., p. 1077, Appeal and Error, par. 1739, Note 67, and cases cited. In Bradley v. Howell, 161 Miss. 346, 133 So. 660, this Court held that erroneously excluded evidence, to warrant reversal, must be such as would be materially effective toward production of a different result. In its opinion in that case the Court said: "But our duty here would not be performed, if, when technical error is shown by a record, we were thereupon to reverse without mature consideration whether the error is substantial, and substantially prejudicial to appellant." In Gelb v. Federal Trade Commission, C.C.A. 2, 144 Fed. 2d 580, the Court held that the refusal of a witness to answer a question on cross-examination went merely to his credibility and did not require that his testimony be stricken. In 5A C.J.S., Appeal and Error, par. 1739, it is said: "Nevertheless it is not every erroneous exclusion of evidence that will suffice to reverse a judgment,

and a case will not be reversed for error in the rejection of evidence unless the error results in a miscarriage of justice or constitutes a substantial violation of a constitutional or statutory right. It is for the reviewing court to determine whether prejudice has resulted; and if such exclusion did not prejudice the complaining party the error is harmless.'' See also Sovereign Camp, W.O.W. v. McClure, 176 Miss. 536, 168 So. 611; Brown v. Jarratt, 228 Miss. 338, 87 So. 2d 874; Harris v. Sims, 155 Miss. 207, 124 So. 325.

Evidence as to the names of the witnesses' informants which the witnesses declined to give in the case that we have here, was not evidence of such cogent or determinative character as to throw any dependable light upon the question whether there was public necessity for the establishment of a new bank in Tunica County, as prayed for in the application of the prospective incorporators; and the ruling of the Board that the witnesses would not be required to divulge the names of the persons who had made the statements referred to, although technically erroneous, is not shown to have been substantially prejudicial to the appellant; and reversible error cannot be predicated upon the Board's action in refusing to require the witnesses to give the names of the persons who had made such statements.

It is next argued on behalf of the appellant in support of its third assignment of error, that the State Board violated one of the most elementary and fundamental principles of judicial inquiry, and at the same time violated a mandatory and express provision of the statute which created the Board, by failing to render a written opinion giving its reasons for granting the certificate of necessity. The appellant's attorneys admit that the Board entered a document which is designated as its ''opinion and decision'', but they say that the instrument gave no reason for the action of the Board, but merely stated its conclusion. The appellant's attorneys argue that the statutory requirement that the

Board render a written opinion showing the reasons for its decision is but another way of commanding the Board to make findings of fact upon which its conclusions are based.

But we think there was no error in the Board's failure to incorporate in its opinion more detailed findings of fact than those which appear in the opinion. The Board found that the five incorporators of the new bank were of full age and of good moral and sound business character, as required by Section 5156, Mississippi Code of 1942, Recompiled; that the procedural requirements set forth in Section 5160 and other applicable statutes had been strictly complied with; and that the Board had before it at the conclusion of the hearing sufficient evidence and information upon which to base a decision in the matter; and the Board found that public necessity required that the proposed bank be chartered and permitted to operate.

The Mississippi statute does not require that the Board make "express" findings of fact to support its ultimate finding or conclusion. The only express finding of fact required under our statute is that the Board shall determine whether the public necessity requires that the proposed new bank be chartered and permitted to operate. If its decision be favorable, then the Board shall order the State Comptroller to give to such prospective incorporators a certificate authorizing them to proceed to incorporate and organize, as provided in Section 5157, Code of 1942, Recompiled. If the decision of the Board be favorable to the organization of the proposed bank the statute requires that the Board render a written opinion and decision, but the statute does not require that the Board make express findings of fact. If the decision of the Board be unfavorable, the statute requires that the Board shall render a written opinion and decision, giving its reasons for rejection.

The appellant's attorneys have cited no Mississippi case in support of the contention that the Board should

have incorporated in its decision and opinion express findings of fact. The appellant's attorneys have cited several cases decided by courts in other jurisdictions under statutes entirely different from the statute which we have before us in this case. Among those cases cited are Chicago R. Co. v. Commerce Commission, Ex Rel. C.M.C. Co. (1929), 336 Ill. 51, 167 N. E. 840, 67 A.L.R. 938; Saginaw Broadcasting Co. v. F. C.C. (1938), 68 App. D.C. 282, 96 F. 2d 554; U.S. v. Baltimore & Ohio R. Co. (1935), 293 U.S. 454, 55 S. Ct. 268, 79 L. Ed. 587; and Petersburg Gas Co. v. City of Petersburg (1922), 132 Va. 82, 110 S.E. 533, 20 A.L.R. 542. But each of those cases was decided under a statute which required specific findings of fact; and the opinions rendered in none of those cases can be of help to us in this case.

In Chicago R. Co. v. Commerce Commission, supra, the decision of the court appears to have been based upon Section 65 of the Commerce Commission Act (Smith-Hurd Rev. Stat. 1927, Ch. 111⅔, par. 69), which required the commission to make and enter findings of fact concerning the subject matter inquired into and enter its order based thereon.

In Saginaw Broadcasting Co. v. F. C.C., supra, the Court had under consideration an appeal taken under Section 402(b)(1) of the Communications Commission Act of 1934, 47 U.S.C.A., par. 402 (b)(1) from an order of the Broadcast Division of the Federal Communications Commission denying the application of the appellant for a radio station construction permit, and granting the application of the intervenors for such a permit. The Court held that the findings of fact made by the Commission in that case were not sufficiently specific. But the decision in that case was based upon the provisions of the act itself, which provided that "the Commission shall within 30 days thereafter file 'a full statement in writing of the facts and grounds for its decision as found and given by it.' "

In United States v. Baltimore & Ohio R. Co. (1935), 293 U.S. 454, 55 S. Ct. 268, 79 L. Ed. 587, the Court had under review an order of the Interstate Commerce Commission entered under authority of the "Federal Boiler Inspection Act", which authorized the Interstate Commerce Commission to require the equipment of locomotives with safety devices to eliminate "unnecessary peril of life and limb." The Commission in its report, though discussing at some length the alleged advantages and disadvantages of the two classes of reverse gear and the expense which the proposed change would entail, left entirely to inference the fundamental question whether the use of hand-operated reverse gear on locomotives caused unnecessary peril to life or limb; and the Court held that a finding upon that question was indispensable because "quasi-jurisdictional." The Court in its opinion in that case said: "The primary question of fact presented for determination was, as the report of the Commission states, 'whether the use of locomotives equipped with hand reverse gear, as compared with power reverse gear, causes unnecessary peril to life or limb.'"

Petersburg Gas Co. v. City of Petersburg, supra, was a rate case decided under a constitutional provision (Sec. 156b) which required that the State Comptroller Commission "certify to the appellate Court all the facts upon which the action appealed from was based and which may be essential for the proper decision of the appeal."

In a comment note on "the necessity, form and contents of express finding of fact to support administrative determinations," which appears in 146 A.L.R., pp 209 et seq., the commentator, at page 214, says: "So far as administrative authorities are endowed by the legislature with the power to make determinations of a judicial nature, no case has been found which would squarely hold that the Federal Constitution requires express findings of fact as a prerequisite of the valid exer-

cise of this power." And near the end of the thirty-page comment note, at page 237, it is said: "It may be safe to state as a general proposition that, irrespective of how the general rules concerning the necessity of express findings may be formulated, no such findings are required, or, at least, the lack of such findings is not reversible error, where the findings are not necessary to enable the reviewing court to perform its function * * *." See State v. Tri-State Teleph. & Teleg. Co. (1939), 204 Minn. 516, 284 N. W. 294, in which it was stated that "reduced to its simplest terms, the purpose of a judicial inquiry into an administrative proceeding is to determine whether the substantial rights of the parties are invaded."

Finally, it is argued on behalf of the appellant that the order of the banking board is not supported by the evidence, and is manifestly erroneous, arbitrary and capricious; and that the order of the Board directing the issuance of a certificate authorizing the prospective incorporators to proceed to incorporate and organize the new bank, and the decree of the chancellor affirming that order, should be set aside and a judgment entered here in favor of the appellant. It is argued that the basic error of the banking board and the chancellor lies in the concept that the granting of a bank charter under the Mississippi statute involved a political or legislative decision, when, as a matter of law, under the statute, the Board acts in a judicial capacity, by reason of the fact that the statute provides that the decision and order of the Board "shall be construed as a judicial finding and appealable as such."

Code Section 5160, supra, provides that if the decision of the banking board is unfavorable to the organization of the new bank, the prospective incorporators, if aggrieved at the unfavorable decision, shall have the right to appeal to the chancery court, and in the event such appeal is taken, "The denial of said certificate by the banking board shall be construed as a judicial finding

and appealable as such.'' The statute also provides that, if the decision of the banking board is favorable to the organization of the proposed bank, an appeal in the manner set forth therein shall be available to any interested organization, person, or persons, who have participated in the proceedings and feel aggrieved by the decision of the banking board.

It is not necessary that we discuss at length the nature of the power under which the banking board was acting when it entered its decision and order on February 25, 1959.

██ █ The authorities are agreed that a State Banking Board or Commission is an administrative body, and not an inferior judicial tribunal, as suggested by the appellant's attorneys in their brief. State ex rel. Dybdal et al. v. State Securities Commission, 145 Minn. 221, 176 N.W. 759; In Re Commercial State Bank, 105 Neb., 248, 179 N. W. 1021; In Re Mee (1922), 45 S.D. 303, 187 N. W. 540; Moran v. State Banking Commission (1948), 322 Mich. 230, 33 N.W. 2d 772; Wall v. Fenner (S.D. 1956), 76 N.W. 2d 722; State Banking Board of Texas v. McCulloch (1958), 316 S.W. 2d 259. That the Board determines facts or passes upon questions which may affect parties and exercises judgment and discretion does not imply that it has judicial power. State ex rel. Dybdal et al. v. State Securities Commission, supra. And the fact that some of its functions may be quasi-judicial in their nature does not make it a court.

''It is a well-settled general principle that nonjudicial functions cannot be exercised by or imposed upon courts, and statutes which attempt to make a court play a part in the administrative process by conferring upon it administrative or legislative, as distinguished from judicial, functions may contravene the principle of separation of powers among the different branches of our government.'' 42 Am. Jur., 563, Public Administrative Law, par. 190.

Two questions are presented for our decision in the last mentioned assignment of error. The first is, what is the nature and extent of the court's power of review, in a case of this kind, and under what circumstances is the Court authorized to interfere with the decision and order of an administrative body acting within the scope of its statutory authority. The second is, whether there is substantial evidence in the record to support the decision and order of the administrative agency.

The nature and extent of the judicial review provided for in said Code Section 5160, supra, we think has been definitely settled by the decision of this Court in Dixie Greyhound Lines, Inc., v. Mississippi Public Service Commission, 190 Miss. 704, 200 So. 579, and the many cases following the rule laid down in that case which have been decided by us since the decision in that case was rendered in 1941. The provisions of the statute relating to appeals in that case were almost exactly the same as the provisions of the statute which we have under review in this case.

In Dixie Greyhound Lines, Inc., v. Mississippi Public Service Commission, supra, the Court had under consideration an appeal taken by the Dixie Greyhound Lines from an order of the Public Service Commission granting to Cox Motor Coaches certificates of public convenience and necessity for the operation of motor bus carriers over certain highways, under authority of Chapter 142, Laws of 1938 (Ch. 4, Title 28, Miss. Code of 1942, Rec.) Section 28 of said Chapter 142, Laws of 1938 (Section 7683, Miss. Code of 1942, Rec.), provides that, in addition to other remedies then available, the state or any party aggrieved by any final finding, order or judgment of the Commission, "shall have the right, regardless of the amount involved, of appeal to the first judicial district circuit court of Hinds County, * * * and in those cases wherein the Commission's order appealed from is a judicial finding the said circuit court shall review, affirm, reverse, or modify the same and enter there-

in such order or judgment as may be right and just; provided that without excluding any other finding, order or judgment of the Commission as constituting a judicial finding, the granting or denial by the Commission of an application for a certificate of public convenience and necessity, or the granting or denial of an application for a permit to operate as a contract carrier, shall be construed as a judicial finding, and appealable as such.''

The Court held in that case among other things: (1) That the section of the statute providing for the appeal was not unconstitutional, since the provision in question merely provided a new method of procedure by which orders of such administrative board may be reviewed by a court, conferring no new judicial power on the court, but simply creating a new procedure by which existing judicial power may be exercised; (2) that a court of competent jurisdiction has the power to review any order made by an administrative commission to determine whether it is supported by substantial evidence, or is purely arbitrary or capricious, beyond the Commission's power, or violates some statutory or constitutional, right of an interested party; (3) that in reviewing an order of an administrative commission, power to make the order and not the mere expediency or wisdom of having made it is the question; and (4) that, in determining that question, the court should consider all relevant questions of constitutional power or right, all pertinent questions concerning whether the order is within the scope of the delegated authority under which it purports to have been made, and whether the order, though in form within delegated power, must be treated as not embraced therein because authority has been exerted unreasonably.

The Court then quoted with approval the following statement from the opinion rendered by the Supreme Court in Shields v. Utah Idaho Central R. Co., 305 U.S. 177, 185, 59 S. Ct. 160, 165, 83 L. Ed. 111: ''The condition which Congress imposed was that the Commission

should make its determination after hearing. There is no question that the Commission did give a hearing. Respondent appeared and the evidence which it offered was received and considered. The sole remaining question would be whether the Commission in arriving at its determination departed from the applicable rules of law and whether its finding has a basis in substantial evidence or was arbitrary and capricious. Id. That question must be determined upon the evidence produced before the Commission.''

 The State Banking Board in this case was the trier of the facts. It was an impartial tribunal legally constituted to determine the rights involved. Its findings were made upon due notice to the appellant and an opportunity to be heard. The appellant appeared and was represented throughout the hearing by able counsel, and the evidence which it offered was received and considered. The Procedure at the hearing was in every way consistent with the essentials of a fair trial; and the hearing was conducted in such a way that there would be opportunity for a court to determine whether the applicable rules of law and procedure were observed. The proceedings were according to established rules which did not violate fundamental rights. There has been no denial of procedural due process of law; and after a careful review of the entire record, including the evidence offered on behalf of the respective parties, we think it is clear that the Board, in arriving at its determination did not depart from the applicable rules of law, and that its finding that the public necessity required that the proposed new bank be chartered, is supported by substantial evidence, and is neither arbitrary nor capricious.

 We have not found, nor has there been called to our attention by counsel, a decision wherein there is a precise definition of ''necessity'' when used in a statute relative to the issuance of a bank charter. Decisions construing similar provisions in statutes per-

taining to other fields of the law are not conclusive or particularly helpful to us in construing the statutory provision under consideration. In our opinion mere convenience is not sufficient to satisfy the statutory requisite of "necessity". But, as stated by the Michigan Court in Moran v. State Banking Commission, supra, when supplemented by proof of facts and circumstances which, as in the instant case, are persuasive of "necessity", it is proper to take into consideration testimony as to the element of convenience. ▆▆ ▆▆ We agree with the statement made by the Michigan Court in its opinion in the Moran case, that the meaning or import of "necessity", as the word is used in a statute such as we have here, is "a substantial or obvious need justifying the chartering of a new bank in view of the disclosed relevant circumstances." See Moran v. State Banking Commission, supra.

▆▆ ▆▆ The statute which we have under review was enacted in the exercise of the police power of the state, in the interest of the public, and as an aid to insure safe banking. Its purpose is not to deter competition or foster monopoly, but to guard the public and public interests against imprudent banking. By the enactment of the statute, the Legislature, in our opinion, did not intend that one or more established banks may keep out another merely because the banking facilities sufficiently take care of the banking business. ▆▆ ▆▆ The applicants for a charter were not required to show that the existing bank was not rendering adequate service to its customers, or that a new bank would be in a position to render better service to the public than the bank already in existence.

We find no reversible error in the record, and the decree of the lower court is therefore affirmed.

Affirmed.

*Hall, Lee, Ethridge* and *Gillespie, JJ.,* concur.
McGEHEE, C. J., Dissenting:

I regret the necessity for so doing but I must respectfully dissent from the majority view in the decision of this case.

Following the "depression" years of the 1930's, the State Legislature realized that the laws governing the banking business in this State needed to be strengthened so as to prevent the location of more than one bank in a given area unless public necessity should require it. Prior to the enactment of Chapter 146, Laws of 1934, there was no restriction on the creation and incorporation of banks in this State, and a person desiring to open a new bank in any locality had only to make the proper application for that purpose.

Again, the Legislature, by Chapter 203, Laws of 1948, realizing the benefits which had come from the Act of 1934, further strengthened the banking laws so as to insure the continuation of the benefits of the 1934 law.

Again, with the same thought in mind, the Legislature further strengthened the banking laws by Chapter 162, Laws of 1954, (Section 5160, Code of 1942, Recompiled.) This Court recognized that this was the determined policy of the Legislature when it said in the case of Oliphant v. The Carthage Bank, 224 Miss. 386, 80 So. 2d 63, the following: "The Court is of the opinion that both by Chap. 203, Laws of 1948, and by House Bill 86, Chap. 162, Laws of 1954, the Legislature was undertaking to further strengthen the provisions of the banking laws in regard to the chartering of new banks, both for the protection of the public welfare, as well as for the protection of persons interested in an existing bank in a particular locality, and that the Legislature intended that these safeguards should be observed and substantially complied with before the issuance of a certificate of public convenience and necessity to the proponents of a new bank would be authorized * * *"

In the case of Oliphant v. Carthage Bank, supra, the Court further said: "We are of the opinion that although the State Banking Board is an administrative

agency, it would be acting in a quasi-judicial capacity in reaching an opinion and decision on the evidence heard by it in the open hearings * * *'' Also, the Court further stated that: ''* * The Carthage Bank had the sole right to operate a bank in the Town of Carthage unless and until the requirements of the banking laws were complied with * * * This right or franchise was a valuable one, entitled to protection until the wholesome provisions of the banking laws, which had been enacted for the protection of existing banks and for the protection of the public, had been substantially complied with. * * *''

The appellant, Planters Bank of Tunica, Mississippi, was established in 1912 in the Town of Tunica in Tunica County, Mississippi, and it has increased its capital stock from $25,000 to nearly one-half million dollars and has recently expended approximately $160,000 for a new banking house, vault and other facilities, presumably with the approval and encouragement of the State Banking Department. Tunica County is one of the smallest counties in the State, and the Town of Tunica, where the appellant Planters Bank is located, has a population of only 853 white people according to the census. There are less than 4,000 white people in the entire county, and the Negro population has been greatly reduced in recent years. There are twenty-four commercial banks within approximately thirteen miles of the county line of this small county.

Pursuant to Section 5160, Code of 1942, the State Comptroller of Banks made an examination and investigation as to whether or not the public necessity required the incorporation of a new bank in the county. He made a record of his findings in writing and drew up his recommendations to the Banking Board, as expressly provided by the provisions of this statute. He recommended that the application for the charter for a new bank be denied. Presumably he took into consideration all of the sixteen factors required by the statute to be taken into consideration in reaching his conclu-

sion and in making his findings and recommendation. His fidings were not made a part of the record so as to disclose on what basis the Banking Board reached its decision. On appeal to the chancery court, the chancellor did not have the benefit of the findings of the Comptroller nor the reasons which actuated the Banking Board in overriding the recommendation of the Comptroller when he recommended that the charter for the new bank be not granted.

It is said that the appellants waived the requirement that the findings of the Comptroller, which, according to the mandate of the statute, should be made a part of the record. During the hearing before the Banking Board a colloquy occurred by the Chairman of the Board and the attorneys, wherein the Chairman stated in substance that he thought a fair interpretation of the statute is that he make his *report* to the Board. Of course a report to the Board should have included both the findings and recommendations of the Comptroller. At any rate, the Chairman offered to let the attorneys see the report and stated that the Board was amenable to any suggestions or agreements that the attorneys may have on it. Thereupon, the attorney for the appellee stated that ''We will not demand or require that he make his recommendations in advance of the hearing and that he may make it, if he sees fit, to the members of the Banking Board in Executive Session.'' And, whereupon, one of the attorneys for the appellant made the following statement: ''On behalf of the opponents, we submit this matter entirely to the discretion of the banking Board to do whatever they think is best under the law and under the circumstances. Whatever you determine will be entirely agreeable to us.''

Thus, it will be seen that the chairman was talking about the report and the attorney for the appellees was talking about the ''recommendations'' of the Comptroller.

I do not base this dissent on the point as to whether or not there was a waiver by the appellant, if indeed he could waive this mandatory requirement as to the findings and the recommendations of the Comptroller being made a part of the record, but this dissent is based, First, upon the fact that the Board conducted a hearing for three or four days primarily upon hearsay and rumors wherein the appellees or their witnesses testified before the Board in support of the application for a charter for the new bank with such statements as "I was told", "they said", "people told me", "some of them say", "I imagine", "I would assume", "I think", and "I guess"; and, Second, in my opinion there is no substantial, competent evidence that would justify a decision on the part of the Banking Board, overruling the findings and recommendations of the State Banking Comptroller, and in holding that public necessity would require the location of a new bank in the Town of Tunica.

It was the theory of the appellees that the sixteen factors on which the statute contemplates that the Comptroller should make findings was complied with when the Board expressly found only one of such factors to exist, and that was that the proposed incorporators of the new bank were men of full age, and of good moral and business character. If this is to be the test, then every town in the State having only one bank, which may be adequately serving the needs of the community, could always find as many as five incorporators of full age and of good moral and business character, and thus the wholesome purpose of the Legislature in strengthening our banking structure so as to prevent too many banks would be effectually destroyed.

It was the further theory of the appellees that those interested in the existing bank were taking part in political elections, and they finally proved that some of those interested in the existing bank had prevailed upon a candidate to withdraw from the race of supervisor in

favor of the incumbent, where the incumbent had originally indicated his purpose not to be a candidate for reelection but had been persuaded to reconsider because of his holding of the office of Vice President of the State Supervisors Association and would be automatically elevated to the Presidency of the said Association if reelected, and had therefore offered for reelction, but as to this one instance it was shown without dispute that one of the proposed incorporators of the new bank had likewise attempted to persuade the candidate to withdraw from the race in favor of the incumbent. This was a matter of county pride on the part of all of those interested in the reelection of the incumbent. All other claims of alleged wrongdoing of those interested in the existing bank were based on rumor and hearsay, and the appellant was denied the right to cross-examine the witnesses and have them disclose the source or sources of their information in order that the appellant might check such rumors and hearsay testimony.

But it is said that the appellant desires to have a monoply on the banking business in Tunica County. If it be considered that there is a monoply in banking anywhere in this State, the situation is such because public interest requires a limit on the number of banks for the protection of depositors. The existing bank has no such monoply on the banking business, since it was shown that many deposits by citizens of Tunica County are kept in three large Memphis banks because of the fact that they have bond and trust departments and facilities for investment of funds and securities, which is not furnished by smaller banks, and there was no substantial proof to show that these depositors in the Memphis banks would bring their funds back to Tunica County, even if a new bank were established there; nor was it shown that those interested in the new bank would not in the future take part in political elections in the interest of good government in the county. I do not think that any of the fanciful theories of the appellees as to

why a new bank is needed at Tunica were supported by substantial and competent evidence; and in my opinion the decision of the Board is against the overwhelming weight of the competent evidence.

Without regard to how the colloquy between the Chairman of the Banking Board and the attorneys should be construed, the fact remains, and it is undisputed, that the record shows that the Comptroller went on record as saying: "I further certify that the record of my said findings was not included by me in the appeal record * * * for the reason that the State Banking Board considered said findings of a confidential nature." The statute in question, in requiring the findings of the Comptroller to be made a part of the record, makes no exceptions where the findings are secretive and confidential. As to the right of the appellant to cross-examine witnesses for the appellees who had based their testimony upon rumors and hearsay, and where the witnesses were excused from giving the source of their information, the Board ruled that the witnesses would not have to give the source of their information on cross-examination "unless the witness wants to."

In the case of Railroad Commission of the State of California v. Pacific Gas & Electric Company, 302 U. S. 388, 82 L. ed. 319, the Court said: "The right to a fair and open hearing is one of the rudiments of fair play assured to every litigant by the Federal Constitution as a minimal requirement. * * * the procedure must be consistent with the essentials of a fair trial * * *"

In the case of Morgan v. United States of America, 304 U. S. 1, 82 L. ed. 1129, the Court said: "The maintenance of proper standards on the part of administrative agencies in the performance of their quasi-judicial functions is of the highest importance * * * they must accredit themselves by acting in accordance with the cherished judicial tradition embodying the basic concepts of fair play."

In the case of Interstate Commerce Commission v. L. & N. R. R. Company, 227 U. S. 88, 57 L. ed. 431, it was said by Justice Lamar speaking for the Court that "In such cases the Commissioners cannot act upon their own information, as could jurors in primitive days. All parties must be fully apprised of the evidence submitted or to be considered, and must be given opportunity to cross-examine witnesses * * * to offer evidence in explanation or rebuttal. In no other way can a party maintain its rights or make its defense * * *"

In the case of Peters v. Hobby, 349 U. S. 331, 99 L. ed. 1129, where a person was denied the right of proper cross-examination in an administrative hearing, the Court said: "Dr. Peters was condemned by faceless informers, some of whom were not known even to the Board that condemned him * * * Under cross-examination their stories might disappear like bubbles. Their whispered confidences might turn out to be yarns conceived by twisted minds or by people who, though sincere, have poor faculties of observation and memory."

In the case of Application of Plainfield-Union Water Company, 11 N. J. 382, 94 A. 2d 673, the Court said: "The determination cannot be made to rest upon undisclosed evidence or information dehors the record which the parties in interest have had no opportunity to test for trustworthiness and explain or rebut."

In 42 Am. Jur. 451, Public Administrative Law, Section 116, it is said: "The inexorable safeguard which the due process clause assures in the exercise of a judicial or quasi-judicial power is that the trier of the facts shall be an impartial tribunal legally constituted to determine the right involved; that no finding shall be made except upon due notice and opportunity to be heard; that the procedure at the hearing shall be consistent with the essentials of a fair trial; and that it shall be conducted in such a way that there shall be opportunity for a court to determine whether the applicable rules of law and procedures were observed."

In 16-A, C.J.S., p. 830, Constitutional Law, Section 624, it is said: "Due process of law generally implies and includes a fair trial * * * according to some settled course of procedure * * * The right of a litigant to a trial in accordance with the forms of law is a vital part of due process * * *"

In the case of Wisdom v. Stegall, 219 Miss. 776, 70 So. 2d 43, this Court said: "It is an essential part of procedural due process that a party to a suit should have the right to interrogate the witnesses upon whose evidence the decree is based * * *" It does no good to interrogate a witness if he is advised that he doesn't have to answer "unless he wants to."

In the case of Powhatan Mining Company v. Ickes, 118 F. 2d 105, it is said: "We are unable to see how there has been a full hearing unless the right to cross-examine has been afforded."

See also National Labor Relations Board v. Prettyman, et al., 117 F. 2d 786; Reilly v. Pinkus, 338 U. S. 269, 94 L. ed. 63; and Carter Products, Inc. v. Federal Trade Commission, 201 F. 2d 446.

For three or four days the Board listened to appellees' charges based on hearsay and rumor, but when asked for the basic right of fair play—the right of proper cross-examination—this was denied. Then, the Board declined to disclose in its opinion any reason for its decision, as required by statute.

The Board entered a document which it designated as its "opinion and decision", but this instrument gave no reason for the action of the Board but merely stated its conclusions.

In the case of Adams v. Y. & M. V. R. R. Company, 77 Miss. 194, 24 So. 317, the Court, in quoting from the case of Houston v. Williams, 13 Cal. 24, defined and distinguished these terms by saying: "The terms 'opinions' and 'decisions' are often confounded, yet there is a wide difference between them * * * A decision of a Court is its judgment. The opinion is the reason given

for that judgment." In the instant case we only have the judgment.

In the case of Chicago Railways Company v. Commerce Commission, Ex Rel., Chicago Motor Coach Company, 336 Ill. 51, 167 N. E. 840, 67 A. L. R. 938, the Court reviewed an order of the Commission granting a certificate of convenience and necessity for the operation of motor busses. The only "finding" of the Commission was that "public convenience and necessity require" that the petition be granted. Holding that this so-called "finding" was but a conclusion of the Commission, the Court stated: "This was not a finding of fact on which any order granting a certificate of convenience and necessity could be based. It was simply the conclusion drawn from all the evidence that the certificate should be granted, without any finding of fact from which the conclusion can be reached."

See also Wichita Railroad & Light Company v. Public Utilities Commission of the State of Kansas, 260 U. S. 48, 67 L. ed. 125; United States v. Baltimore & Ohio Railroad Company, 293 U. S. 454, 79 L. ed. 587; and Hunter v. Hussey, La. App., 90 So. 2d 429; and Annotations in 146 A. L. R. 209 and 42 Am. Jur. 494.

The appellees rely upon the cases of Moran v. Nelson, Commissioner of Banking Department, 322 Mich. 230, 33 N. W. 2d 772, which involved the establishment of a new bank in the City of Detroit, the fourth largest city in the United States. Detroit only had one bank to each 270,000 population. If a bank is created in Tunica County, there will be a bank to each 1969 white persons. It is unnecessary to point out the difference between the situation shown in the Moran case, supra, and that shown in the instant case.

The appellees also rely upon the case of State, ex rel., Dodd, et al. v. Hill, Banking Commissioner (W.Va.), 100 S. E. 286, which was decided in 1919, prior to the strengthening of the banking laws in the several states. In that case the statute vested in one man the sole dis-

cretion in the matter of chartering new banks, and there was no requirement for a public hearing, or any hearing, or any provision for appeal, and no provision that the issue would be construed as a judicial determination. The Illinois case of Schweder v. Brady, Auditor of Public Accounts, 268 Ill. 192, 108 N. E. 1009, and the case In Re Lunghino & Sons, 176 App. Div. 285, 163 N. Y. Supp. 9, where both were decided prior to 1919 before the strengthening of the banking laws of the various states.

Then, the appellees cite two cases from South Dakota, In Re Mee, et al. v. Hirning, Supt. of Banks, et al., 45 S. D. 303, 187 N. W. 540, and Wall v. Fenner, 76 N. W. 2d 722, but in those cases the action of the Banking Commission was final. Neither of the cases, in my opinion, are applicable here.

Finally, the appellees urge that the case at bar be likened unto the cases decided by this Court on appeal from the Public Service Commission. But the statute there under consideration provides that the determination of the Commission "shall be received in all courts and by every officer in civil cases as prima facie evidence that such determination was right and proper", and there the statute provides that "the findings of fact by the Commission, if supported by substantial evidence, shall be conclusive and shall not be reversed by any court", still, despite these statutory announcements, our Court has uniformly held that their decisions are subject to reivew by this Court in order that it may be determined whether the decision of the Commission is supported by substantial evidence, whether it is arbitrary or capricious, or beyond the power of the Commission to make. How could the Chancery Court of Tunica County, as a reviewing court, and this Court, as an appellate court, determine whether or not the judgment of the Board in the instant case was not influenced mainly by the incompetent hearsay testimony

and rumors, as to which the appellant was denied the right of cross-examination?

I think that the decision of the Banking Board was not only based on incompetent hearsay testimony and rumors but that its decision was contrary to the over-whelming weight of the competent testimony and should be reversed. To allow the chartering of a new bank in the Town of Tunica under the facts and circumstances of this case would, in my opinion, defeat the purpose and intention of the Legislature which is so clearly re-vealed in Section 5160, Code of 1942, and which was de-signed to prevent the organization of more banks than needed in a particular locality. No public necessity for the organization of a new bank in the instant case is shown by the record, in my opinion.

## ON SUGGESTION OF ERROR AND MOTION

ETHRIDGE, J.

Appellant's suggestion of error reargues substantial-ly the same points made on the original submission and dealt with in our opinion in 122 So. 2d 256. The Court in banc has considered carefully the issues, and con-cludes that the suggestion of error should be overruled. One additional comment seems pertinent: Appellant's argument, that our original decision overruled *sub silen-tio* Oliphant v. The Carthage Bank, 224 Miss. 386, 80 So. 2d 63 (1955), is incorrect. That case involved prin-cipally the invalidity of a conditional order of the board. It has no application here.

Because of the disposition of this case on sugges-tion of error, with eight judges participating, appel-lant's motion for a hearing before the full Court in banc is moot, and that motion is dismissed.

Suggestion of error overruled, and motion for hear-ing in banc dismissed, because moot.

*Hall, Lee, Kyle* and *Gillespie, JJ.,* concur; *McGehee, C. J.,* and *Holmes* and *Arrington, JJ.,* dissent as to sug-gestion of error. *McElroy, J.,* took no part.